Jean A. SHAY, Personal Representative of the Estate of Daniel T. Shay, III, Deceased, and Jean A. Shay, Individually and in Her Own Right

v.

FLIGHT C HELICOPTER SERVICES, INC., David J. Bratkovics; Peter Lombardi; Enstrom Helicopter Corporation; Bendix Engine Products Division; AlliedSignal, Inc. and Teledyne Industries, Inc.

Appeal of Flight C Helicopter Services Inc. and Peter Lombardi (at 3101).

Jean A. Shay, Personal Representative of the Estate of Daniel T. Shay, III, Deceased, and Jean A. Shay, Individually and in Her Own Right

v.

Flight C Helicopter Services, Inc., David J. Bratkovics; Peter Lombardi; Enstrom Helicopter Corporation; Bendix Engine Products Division; AlliedSignal, Inc. and Teledyne Industries, Inc.

Appeal of Jean A. Shay, Personal Representative of the Estate of Daniel T. Shay, III, Deceased, and Jean A. Shay, Individually and in Her Own Right (at 3284).

Superior Court of Pennsylvania.

Argued Oct. 29, 2002.
Filed March 4, 2003.

James M. Connelly, Philadelphia, for Flight C Helicopter and Lombardi.

Richard Genter, Philadelphia, for Shay.

Before: JOHNSON, BENDER and KELLY, JJ.

BENDER, J.

¶ 1 In this wrongful death and survival action, Flight C Helicopter Services, Inc. (Flight C) and Peter Lombardi (Lombardi) (collectively, Defendants) appeal the October 4, 2000 order entering judgment and molding the verdict against them to include an award of delay damages and raise other various allegations of error. Jean A. Shay, personal representative of the Estate of Daniel T. Shay, III, deceased, and Jean A. Shay, individually (collectively, Plaintiff), filed a cross appeal to the October 4, 2000 order. Specifically, Plaintiff challenges the trial court's decision to limit delay damages held to be the responsibility of the Pennsylvania Property and Casualty Insurance Guaranty Asso-

ciation (PPCIGA)[1] to a pro rata portion based upon PPCIGA's statutory limit of liability. Since PPCIGA was not a party in the underlying action or in any other action related to this case, such as a declaratory judgment action, the trial court did not have any authority to order delay damages against PPCIGA. Accordingly, we are constrained to vacate, in part, the order awarding delay damages.

¶ 2 The trial court, the Honorable Allan L. Tereshko, set forth the following factual history of this case in his Pa.R.A.P.1925(a) opinion:

This matter is before the Court as the result of a helicopter crash which occurred on October [6, 1995], in which Daniel Shay and a passenger were killed as the result of injuries they sustained in the crash. Defendant Flight C Helicopter Services is a corporation with its principal place of business at the Quakertown–Bucks County Airport, located in Quakertown, Pennsylvania. Flight C Helicopter is a maintenance operation with a hangar and offices which are used for the business of maintaining customers' aircraft. Defendant, Peter Lombardi is the owner and president of Flight C Helicopter Services and maintains this business as a maintenance provider for aircraft. Defendant David Bratkovics,[2] was hired by Peter Lombardi as an aircraft mechanic for Flight C Helicopter Services to perform maintenance services on aircraft.

Prior to the helicopter accident, Daniel Shay, now deceased, brought his En-

---

1. PPCIGA assumed the defense of this case when Flight C's property and casualty insurer became insolvent. PPCIGA exists pursuant to the Pennsylvania Property and Casualty Insurance Guaranty Association Act, 40 P.S. §§ 991.1801–991.1820 (the Act). PPCIGA was created initially in 1970 as the "Pennsylvania Insurance Guaranty Association," commonly referred to as "PIGA." *See* 40 P.S. §§ 1701.101 *et seq., repealed,* Feb. 10, 1995. The Act is intended "to give a measure of protection to policyholders and claimants who are faced with financial loss because of the insolvency of certain carriers of property and casualty insurance." *Strickler ex rel. Strickler v. Desai* 813 A.2d 650, 656 (Pa.2002) (citation omitted). The fund established by PPCIGA consists of assessments collected from member insurers, who are all insurers authorized to write property and casualty policies in the Commonwealth. 40 P.S. § 991.1803.

The purpose of PPCIGA is "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1). Pursuant to the express terms of the Act, PPCIGA is "deemed the insurer to the extent of its obligation on the covered claims and, to such extent, shall have all rights, duties and obligations of the insolvent

insurer as if that insurer had not become insolvent." 40 P.S. § 991.1803(b)(2). Accordingly, "PPCIGA is deemed to be an insurer and is placed in the stead of the insolvent insurer, with all of that insurer's rights and duties and obligations" subject, of course, to the statutory limitations on liability provided by the Act. *Donegal Mut. Ins. Co. v. Long,* 528 Pa. 295, 597 A.2d 1124, 1127 (1991).

PPCIGA is obligated to defend an insured (whose insurer is insolvent), and provide payment for covered claims in an amount "equal to the lesser of [PPCIGA's] covered claim obligation or the applicable policy limit." 40 P.S. § 991.1803(b)(1)(i). PPCIGA's "covered claim obligation" is "[a]n amount not exceeding ten thousand ($10,000) dollars per policy for a covered claim for the return of unearned premium" or "[a]n amount not exceeding three hundred thousand ($300,000) dollars per claimant for all other covered claims[,]" the latter of which is applicable in the instant case. *Id.* at § 991.1803(b)(1)(i)(A), (B). Under no circumstances is PPCIGA "obligated to pay a claimant an amount in excess of the obligation of the insolvent insurer under the policy or coverage from which the claim arises." *Id.* at § 991.1803(b)(1)(ii).

2. David Bratkovics (Bratkovics) was a defendant in the underlying action, but is not a party to the instant appeal.

strom Model 280C helicopter to [Flight C] for the maintenance of the helicopter's powerplant. On or about October 6, [1995], the Defendant David Bratkovics performed maintenance work on the decedent's helicopter. Specifically, Defendant Bratkovics replaced the single drive dual magneto in the helicopter's powerplant which previously he never did as a mechanic. This single drive dual magneto system provided ignition for the helicopter's powerplant operation. Plaintiff's experts Manuel Raefsky, metallurgical engineer, and David Phillips, aircraft accident reconstruction expert, concluded in their testimony, that the magneto fell off the back of the engine in flight, causing the engine to shut down as a result of the bolts holding the magneto clamp being improperly torqued. David Phillips further testified that the maintenance records of this helicopter reflect Flight C was the last to perform maintenance on the magneto. Defendant Bratkovics testified that on October 6, [1995], he worked for [Flight C] and performed maintenance work on the helicopter.

On October [6, 1995], Daniel Shay, the decedent, went to [Flight C] to pilot his helicopter. Defendant Bratkovics testified that there was no placard on the helicopter indicating that it was not airworthy. The decedent took off with a passenger and flew the helicopter to an altitude of approximately 200 to 300 feet. After reaching this altitude, the decedent pilot began to experience control difficulties. Plaintiff's witness, Mr. Tim Snellman, described what he heard as a witness to the helicopter accident that day as, "at first the engine was just running very poorly and then a second time there was three pops specifically that happened, like the engine was backfiring as it was shutting off." The helicopter rapidly descended into a wooded area and then subsequently erupted in flames. Both the pilot of the helicopter, Daniel Shay[,] and a passenger were killed as a result of injuries they sustained from the crash and post crash fire of the helicopter. Dr. Ian Hood, Deputy Medical Examiner for the City of Philadelphia, testified that the cause of the decedent Plaintiff's death as determined by the autopsy findings was the fire, with some contribution from some relatively minor blunt trauma that he had sustained in the crash itself.

Trial Court Opinion, 12/17/01, at 1–3 (citations to trial transcript omitted). At the time of the accident, Flight C was a named insured on a comprehensive general liability insurance policy (also called a general liability airport policy), with coverage of up to $1,000,000 per occurrence on account of bodily injury, including death, which was issued by American Eagle Insurance Company (American). American was an insurance company organized under the Texas Insurance Code and licensed to issue policies in Pennsylvania.

¶ 3 Plaintiff filed a wrongful death and survival action, sounding in negligence, against Defendants and Bratkovics on November 29, 1996, with original service of process occurring on December 11, 1996.[3] Complaint, 11/29/96, at ¶¶ 23–26. Defendants filed an answer with new matter on January 20, 1997, in which they asserted that Bratkovics was not an agent, servant and/or employee of Flight C, but was,

---

**3.** Initially, the complaint also named Enstrom Helicopter Corporation, Bendix Engine Products Division, AlliedSignal Inc., and Teledyne Industries, Inc., as defendants. On October 31, 1997, the trial court approved a settlement between Plaintiff and these defendants in the gross sum of $500,000. Accordingly, the remaining defendants who proceeded to trial were Flight C, Lombardi, and Bratkovics.

rather, an independent contractor and, therefore, Defendants were not vicariously liable for Bratkovics' negligent maintenance or repair of the decedent's helicopter. Answer of Defendants', [Flight C and Lombardi], to Plaintiffs' Complaint with New Matter, 1/20/97, at ¶¶ 3, 60.

¶ 4 On December 3, 1997, the District Court of Travis County, Texas, issued a temporary restraining order, followed by a temporary injunction on December 16, 1997, declaring American insolvent and placing its property and assets into a temporary receivership under the control of the Commissioner of Insurance of the State of Texas. On December 22, 1997, the District Court of Travis County again declared American's insolvency, issued a permanent injunction, ordered the liquidation of American, and appointed a permanent receiver. Upon issuance of the permanent injunction, Defendants' counsel, James K. Brengle, Esq. (Attorney Brengle), petitioned the trial court for a stay of the proceedings in this case and transfer of the file to PPCIGA.[4] Accordingly, on January 26, 1998, the trial court ordered that the proceedings in this case be stayed for ninety days pursuant to section 991.1819 of the Act. The stay was lifted on April 26, 1998. Neither party indicates in their briefs exactly when PPCIGA assumed the defense in this case. However, based on pleadings in the record, it appears that the case was transferred to PPCIGA sometime after entry of the permanent injunction (on December 22, 1997) and before February 3, 1998. See Memorandum of Law of Defendants [Flight C and Lombardi] in Opposition to Plaintiff's

Motion for Delay Damages Pursuant to Pa.R.C.P. 238, 11/5/99, at 4, 7. Moreover, at oral argument on this appeal, counsel indicated that PPCIGA had assumed defense of this case pursuant to its statutory mandate under the Act to assume the role of the insolvent insurer as if the insurer had not become insolvent. See 40 P.S. § 991.1803(b)(2).

¶ 5 The case proceeded to a jury trial on October 12, 1999. During trial, the court denied Defendants' Motion for Non-Suit/Directed Verdict on the vicarious liability issue. The trial lasted four days. Bratkovics represented himself at trial. Although the case was transferred to PPCIGA prior to trial, Attorney Brengle continued to represent Defendants throughout trial.

¶ 6 On October 15, 1999, the jury rendered their verdict in which they determined that Bratkovics was an employee of Flight C and, therefore, the jury returned a verdict in favor of Plaintiff and against Defendants and Bratkovics in the amount of $3,005,800. The jury did not apportion damages among Flight C, Lombardi, and Bratkovics. The verdict was placed on the docket on October 21, 1999.

¶ 7 On October 19, 1999, Plaintiff filed a petition for delay damages pursuant to Pa.R.C.P. 238. Plaintiff asserted that delay damages began to accrue on December 11, 1997, i.e., one year after original process was first served in this action. Plaintiff's Motion for Delay Damages Pursuant to Pa.R.C.P. 238, 10/19/99, at ¶ 4. In conformity with Rule 238, Plaintiff averred that Defendants and Bratkovics did not

4. Attorney Brengle, as an attorney of record for insureds of American, filed the petition for stay of proceedings on behalf of American pursuant to 40 P.S. § 991.1819(a) which reads, in pertinent part:

All proceedings in which the insolvent insurer is a party or is obligated to defend a party in any court in this Commonwealth shall be stayed for ninety (90) days from the date the insolvency is determined to permit proper defense by [PPCIGA] of all pending causes of action.

Id.

make any offer of settlement and that Plaintiffs did nothing to delay trial. *Id.* at ¶ 5. Accordingly, Plaintiff requested delay damages in the amount of $453,566.99. *Id.* at ¶ 6. Plaintiff served the petition upon Defendants, by way of Attorney Brengle, and Bratkovics, who continued to proceed *pro se.* Plaintiff did not mention PPCIGA in its petition for delay damages, did not serve their petition upon PPCIGA, and did not institute any separate action demanding payment from PPCIGA.

¶ 8 In response to Plaintiff's motion for delay damages, Defendants asserted that delay damages were not awardable because (1) the jury failed to apportion the verdict by assessing percentages of liability against Flight C, Lombardi, and Bratkovics; (2) Defendants' insurance carrier was insolvent at the time delay damages would have begun to accrue; and (3) a settlement offer had been made. Response of Defendants [Flight C and Lombardi] in Opposition to Plaintiff's Motion for Delay Damages Pursuant to Pa.R.C.P. 238, 11/5/99, at ¶¶ 3–5.

¶ 9 On October 21, 1999, Defendants filed a post trial motion requesting entry of a judgment notwithstanding the verdict or a new trial on the basis that the trial court erred in denying their Motion for Non–Suit/Directed Verdict. On August 8, 2000, the trial court denied Flight C and Lombardi's post trial motion and further ordered as follows:

> Within 10 days of the entry of this Order, Plaintiff and Defendant shall submit a statement of delay damages on the full verdict *and a statement on the punitive pro rata share of any such damages against [PPCIGA] based upon its statutory obligation of $300,000.00.*

Order, 8/8/00 (emphasis added). Defendants responded to this order with a Statement of Delay Damages filed on August 18, 2000. In this Statement of Delay Damages, submitted by Attorney Brengle, Defendants asserted that PPCIGA "is not a party to this civil action. The jury did not render a verdict against the [PPCIGA]. Therefore, the [PPCIGA] cannot be ordered to pay delay damages." Defendants' Statement of Delay Damages, 8/18/00, at 2.

¶ 10 Nevertheless, on October 4, 2000, the trial court awarded delay damages and molded the verdict as follows:

> AND NOW, to wit, this 4th day of October, 2000, it is hereby Ordered and Decreed that the Plaintiff is awarded delay damages in the amount of $665,359.68. As a result of the bankruptcy and receivership of Defendants' insurance carrier, [PPCIGA] assumed its statutory responsibility for the carrier up to its limit of $300,000. [PPCIGA] did not tender any amount of its level of responsibility. [PPCIGA] is found to be responsible for a pro rata share of the delay damages calculated from 4/26/98 to 8/10/00 based upon the $300,000 statutory limit. This is calculated to be $47,643.61.
>
> Therefore, the verdict is molded to include delay damages. The verdict of the jury was $3,005,800.00 which is added to delay damages of $665,359.68 ([PPCIGA] shall be responsible for $47,643.61 of this amount) for a total of $3,671,159.68.
>
> Accordingly judgment is entered for Plaintiff and against Defendants in the amount of $3,671,159.68.

Order, 10/4/00. Defendants filed a notice of appeal from this order on October 31, 2000. Plaintiff filed a notice of cross-appeal from this order on November 9, 2000, challenging only that portion of the order that limits delay damages to PPCIGA's pro rata share based upon its statutory level of responsibility. In addition to the parties' briefs, the Pennsylvania Trial

Lawyers Association (PTLA) filed an *amicus curiae* brief with this Court in support of Plaintiff's position.

¶ 11 We first address the sole issue Plaintiff raises in her cross-appeal:

Is [PPCIGA], standing in the shoes of an insolvent insurer, liable for the full payment of delay damages assessed against a defendant under Pa.R.Civ.P. 238, where [PPCIGA] fails to offer its statutory limit of liability and where the payment of delay damages would result in a total payment by [PPCIGA] in excess of its statutory limit per covered claim?

Plaintiff's brief at 6. Similarly, in their *amicus curiae* brief, PTLA argues that PPCIGA is, at a minimum, liable for delay damages based on the statutory cap provided in the Act, but should be liable for the full amount of delay damages. PTLA *Amicus Curiae* Brief at 3. However, as explained below, we are unable to address the issue of the amount of delay damages PPCIGA is liable for, if any.

¶ 12 On October 30, 2002, we held oral arguments on this appeal. During oral argument, we granted permission to each party to submit supplemental letter briefs on the issue of the trial court's authority to order PPCIGA to pay delay damages. Resolution of this issue is crucial because if the trial court did not have the authority to direct PPCIGA to pay delay damages, we must vacate the order insofar as it pertains to PPCIGA, and we need not address the issue of what amount of delay damages for which PPCIGA is responsible.

¶ 13 In their supplemental letter brief, dated November 12, 2002, Defendants assert:

It continues to be [PPCIGA's] primary contention that the trial court had no legal authority or basis to [o]rder [PPCIGA] to pay any money award, let alone delay damages which were assessed in the amount of $47,643.61, *when [PPCIGA] was not a party/defendant to this action.* If the trial court's Order in this regard were allowed to stand, clearly the rights and due process of not only [PPCIGA], but all defendant parties are severely prejudiced and irreparably harmed if monies are able to be awarded by the court, without the accompanying opportunity to defend.

Defendants' Supplemental Letter Brief, 11/12/02, at 1 (emphasis added). In response, Plaintiff claims this issue is waived for Defendants' failure to preserve it in the trial court. Plaintiff's Reply Letter Brief, 11/22/02, at 1.

¶ 14 Typically, a challenge to the court's jurisdiction is raised by preliminary objection in response to the filing of a complaint. Pa.R.C.P. 1028(a)(1) ("Preliminary objections may be filed by any party to any pleading and are limited to the following grounds: (1) lack of jurisdiction over ... the person of the defendant....."). However, that course of action could not have been followed by PPCIGA because it is not, and never was, a party in this case. *See Department of Pub. Welfare v. Alessi,* 119 Pa.Cmwlth. 160, 546 A.2d 157, 158 (1988). In any event, Attorney Brengle raised the issue in the trial court immediately after the court's August 8, 2000 order directing the parties to file statements of PPCIGA's responsibility for delay damages. Defendants' Statement of Delay Damages, 8/18/00, at 2.[5] Accordingly, the issue has not been waived.

---

5. Attorney Brengle represented Defendants from the initiation of this case, when the defense was provided by American. It appears that Attorney Brengle continued representing Defendants after American's insolvency, when PPCIGA stepped into American's

¶15 We conclude initially that the trial court's October 4, 2000 order is void *ab initio* insofar as it directs PPCIGA to pay any amount of damages, including delay damages, because PPCIGA is not a party in this case, nor did any party in the underlying action file a declaratory judgment action against PPCIGA or otherwise seek to assert rights against PPCIGA.

> [T]he conclusive character of a judgment or decree depends not only upon the statutory grant of jurisdiction to the court pronouncing it, *but upon actual jurisdiction over the persons whose rights are the subject of the investigation. Unless the court has the parties before it, by appearance or service of process, it is obvious that it cannot bind them by its adjudications.*

*Meritor Mortgage Corp.-East v. Henderson,* 421 Pa.Super. 339, 617 A.2d 1323, 1325–26 (1992) (quoting *Vichosky v. Boucher,* 162 Pa.Super. 598, 60 A.2d 381, 382 (1948)). Lack of notice and an opportunity to be heard constitutes a violation of due process of law and results in an invalid judgment. *Meritor Mortgage Corp.-East,* 617 A.2d at 1325. *See also In re Galli's Estate,* 340 Pa. 561, 17 A.2d 899, 903 (1941) ("[N]otice was indispensably necessary to give jurisdiction, and, without such notice and an opportunity to appellant to be heard, the decrees of the court were absolutely void."); *Brokans v. Melnick,* 391 Pa.Super. 21, 569 A.2d 1373, 1376 (1989) (permitting collateral attack on decree "since a void decree can be attacked at any time, in any court"); *Alessi,* 546 A.2d at 159 n. 3 (concluding that where trial court ordered Department of Public Welfare (DPW) to pay for commitment of patient but DPW had not been party to underlying proceedings, DPW was denied "due pro-

cess which requires at a minimum adequate notice and an opportunity to be heard before a judgment is reached"); *Vichosky,* 60 A.2d at 382 (concluding invalidity of judgment apparent on face of record where judgment was entered before defendant received notice).

¶16 Although PPCIGA assumed defense of this case after American's insolvency and pursuant to its statutory obligation under the Act, the trial court could not order PPCIGA to do anything when PPCIGA itself was not a party before the court. *See Alessi,* 546 A.2d at 159. No appearance was made on behalf of PPCIGA, no notice was served upon PPCIGA, and PPCIGA had no opportunity to argue its position regarding the amount of damages for which it was obligated pursuant to the underlying American insurance policy as circumscribed by the statutory limitations of the Act.

¶17 Accordingly, this Court is unable to address the foremost issue argued by the parties in this case, *i.e.,* the amount of delay damages, if any, for which PPCIGA is responsible. We agree with Defendants' statement that:

> in order for [PPCIGA] to be open to liability over and above the statutory cap of $300,000 in this matter, there necessarily must to [sic] have been either a Complaint in Mandamus or Petition for Declaratory Judgment action brought against [PPCIGA], when same was ripe for filing, before same may be entertained by any court of competent jurisdiction.

Defendants' Supplemental Letter Brief, 11/12/02, at 1. Indeed, in one of the cases Plaintiff relies upon, *Allen v. Mellinger,* 567 Pa. 1, 784 A.2d 762 (2001), our Supreme Court concluded that delay dam-

---

shoes and undertook the defense. Attorneys J. Bruce McKissock, Esq., and James M. Connelly, Esq., represent Defendants in this appeal. Notably, however, the docket does not indicate that anyone made an appearance on behalf of PPCIGA at any time.

ages recoverable from a Commonwealth agency are limited to those calculated based upon the Sovereign Immunity Act's statutory cap. However, the Commonwealth agency in *Allen* was a defendant in the underlying action. As a party in the underlying action, the Commonwealth agency had an opportunity to file a motion requesting that the trial court mold the verdict to conform to the statutory cap. *Id.* at 764. No such opportunity was afforded to PPCIGA in this case. *See also Strickler*, 813 A.2d at 653 (plaintiffs, in medical malpractice case against physician whose insurer became insolvent, filed motion to compel PPCIGA to fund settlement and then PPCIGA filed petition to intervene); *Lahav ex rel. Lahav v. Main Line Ob/Gyn Assocs., P.C.*, 556 Pa. 245, 727 A.2d 1104, 1105 (1999) (parents of premature infant, who were successful in medical malpractice action against physician, filed declaratory judgment action against physician, insurer, and Medical Professional Liability Catastrophic Loss Fund (CAT Fund) to determine liability for delay damages); *Elliott–Reese v. Medical Prof'l Liab. Catastrophe Loss Fund*, 805 A.2d 1253, 1255 (Pa.Cmwlth.2002) (plaintiff won verdict against defendant physicians in underlying medical malpractice action and then filed complaint in mandamus against CAT Fund and PPCIGA seeking payment of delay damages and post-judgment interest); *Storms v. O'Malley*, 779 A.2d 548, 555 (Pa.Super.2001) (medical malpractice case in which PPCIGA, who had undertaken defense of doctor whose insurer had become insolvent, was granted motion to intervene so it could challenge plaintiff's motion to compel settlement); *Keystone Aerial Surveys, Inc. v. Pennsylvania*

*Prop. & Cas. Ins. Guar. Ass'n*, 777 A.2d 84, 88 (Pa.Super.2001) (insured defendant, whose insurer became insolvent, settled with plaintiffs for $1,500,000, and subsequently filed declaratory judgment action against PPCIGA seeking coverage for same amount); *Panea v. Isdaner*, 773 A.2d 782, 786 (Pa.Super.2001) (plaintiff in medical malpractice action filed petition to enforce settlement against PPCIGA and then PPCIGA intervened); *McMahon v. Caravan Refrigerated Cargo, Inc.*, 406 Pa.Super. 303, 594 A.2d 349, 352 (1991) (plaintiff obtained default judgment against defendant whose insurer became insolvent, and plaintiff thereafter filed separate action seeking recovery from PPCIGA).

¶ 18 Since PPCIGA was not a party in the underlying action and no proceedings were instituted in the trial court against PPCIGA, such as a declaratory judgment action, we conclude that the trial court did not have the authority to assess delay damages, or any damages for that matter, against PPCIGA. We are constrained to vacate that portion of the October 4, 2000 order apportioning damages to PPCIGA and directing PPCIGA to pay delay damages in the amount of $47,643.61.

¶ 19 We now proceed to address the issues Defendants raise on appeal.[6] Initially, we note that Defendants have waived two of their issues for failing to cite any legal authority. In their first issue, Defendants assert that the trial court erred by failing to direct the jury to apportion negligence by percentages among Flight C, Lombardi, and Bratkovics as required by the verdict sheet and, therefore, Defendants claim they are entitled to a new trial. Appellant's brief at 7–8. In

---

6. Defendants list eight issues in their statement of questions involved, which do not correspond with the argument portion of their brief. Accordingly, we review Defendants' issues as they are presented in the argument portion of their brief, numbered I through VII, noting that the last two issues address delay damages and will be addressed together.

their third issue, Defendants' challenge the trial court's admission of certain testimony and evidence. *Id.* at 19–22. Defendants cite absolutely no legal authority to support their arguments on either of these issues. Accordingly, Defendants' first and third issues are waived. *See* Pa.R.A.P. 2119(a); *Andaloro v. Armstrong World Indus., Inc.,* 799 A.2d 71, 82–83, (Pa.Super.2002).

¶ 20 In their second issue, Defendants argue that the trial court erred by denying their Motion for Non–Suit/Directed Verdict because Plaintiff failed to establish that Bratkovics was employed by Defendants and, therefore, Defendants were not vicariously liable for Bratkovics' negligent maintenance of decedent's helicopter. Appellant's brief at 5, 8–19.

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are [sic] identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case.

*Joseph F. Cappelli & Sons, Inc. v. Keystone Custom Homes, Inc.,* 815 A.2d 643, 2003 WL 61253, \*3 (Pa.Super.2003) (citation omitted). Likewise,

[a] motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiffs' evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from

the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered. A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

*Parker v. Freilich,* 803 A.2d 738, 744–45 (Pa.Super.2002) (citation omitted).

¶ 21 In light of our standard of review, the question Defendants raise is whether Plaintiff presented sufficient evidence such that the jury could determine that Bratkovics was an employee, rather than an independent contractor.

"[A] determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case." [*Universal Am–Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer),* 563 Pa.480, 762 A.2d 328, 330–31 (2000)]. When deciding this issue, the criteria set forth in [*Hammermill Paper Co. v. Rust Eng'g Co.,* 430 Pa. 365, 243 A.2d 389 (1968)] are applicable and are to be followed by a reviewing court. The Supreme Court in *Hammermill Paper* stated that:

While no hard and fast rule exists to determine whether a particular relationship is that of employer-employee or owner-independent contractor, certain guidelines have been established and certain factors are required to be taken into consideration:

"Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time."

*Id.* at 392 (quoting *Stepp v. Renn,* 184 Pa.Super. 634, 135 A.2d 794, 796 (1957)).

Whether some or all of these factors exist in any given situation is not controlling. Further, while each factor is relevant, there are certain guidelines that have been elevated to be dominant considerations.... **[O]ur case law confirms, that control over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status.**

*Universal Am–Can,* 762 A.2d at 333 (emphasis added).

*State Auto. Mut. Ins. Co. v. Christie,* 802 A.2d 625, 628 (Pa.Super.2002). In other words:

the basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged.... The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner

of performing it, being responsible only for the result.

*Myszkowski v. Penn Stroud Hotel, Inc.,* 430 Pa.Super. 315, 634 A.2d 622, 625–26 (1993) (quoting *Green v. Independent Oil Co.,* 414 Pa. 477, 201 A.2d 207, 210 (1964)). According to the above excerpt from *Myszkowski,* actual control or direction over the work is not necessary to find an employer-employee relationship. Instead, it is the purported employer's *right* to direct or control the manner of work that is relevant. *See also Weatherly Area Sch. Dist. v. Whitewater,* 532 Pa. 504, 616 A.2d 620, 622 (1992) ("It is not ... the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." (citation omitted)).

¶ 22 Viewing the evidence in the light most favorable to Plaintiff, we conclude that Plaintiff presented sufficient evidence such that the trial court properly denied Defendants' Motion for Non-Suit/Directed Verdict on this issue and, therefore, the trial court properly submitted to the jury the question of whether Bratkovics was Defendants' employee. Flight C is a commercial flight operation that leased a hangar from the Bucks County Airport Authority (BCAA) for the purpose of providing, *inter alia,* certain aircraft maintenance services. N.T. Trial, 10/13/99 (Morning Session), at 104–105. Lombardi is the sole shareholder, officer, and director of Flight C. *Id.* at 71, 104. The lease agreement between Flight C and BCAA, signed by Lombardi, provided that Flight C would be solely responsible for and guarantee the safety of any aircraft owned or operated by it. *Id.* at 107.

¶ 23 Flight C advertised its helicopter maintenance services in the yellow pages. *Id.* at 72. Although Lombardi was not a

licensed mechanic at the time of the accident, Lombardi hired Bratkovics and other licensed mechanics to perform aircraft maintenance for Flight C's customers. *Id.* at 11, 51. Clearly, Flight C was in the business of aircraft maintenance.

¶ 24 Bratkovics worked part-time at Flight C. *Id.* at 50. Bratkovics had no business cards of his own indicating that he was in the business of maintaining aircraft. *Id.* at 13. Lombardi obtained customers, communicated with customers about maintenance work, assigned work to Bratkovics, and billed customers for the work Bratkovics performed. *Id.* at 13–16. Flight C, through Lombardi, charged customers $40 per hour for maintenance services, and then paid Bratkovics $20 per hour for the work he performed. *Id.* at 14. Clearly, Bratkovics was not engaged in an occupation or business distinct from that of Flight C, and Bratkovics was paid by the time rather than by the job.

¶ 25 Lombardi provided Bratkovics with aircraft maintenance manuals and stored Bratkovics' tools at the Flight C facility. *Id.* at 14. Lombardi ordered and paid for the parts needed for helicopter repairs. *Id.* at 15. Notably, Bratkovics testified that *Lombardi could inspect and supervise his work, and provide advice and suggestions about Bratkovics' work*, although Lombardi could not do any work himself since he was not a licensed mechanic. *Id.* at 53–54. Bratkovics, however, admitted that Lombardi would sometimes assist Bratkovics with maintenance work. *Id.* at 54–55. On one particular occasion, Lombardi had discussions with the decedent and the Federal Aviation Administration (FAA) concerning Bratkovics' installation of a cooling assembly on decedent's helicopter, thereby indicating Lombardi's, and therefore Flight C's, involvement in the maintenance process. *Id.* at 15.

¶ 26 Defendants emphasize that, because Bratkovics was a licensed mechanic and Lombardi was not, Federal Aviation Regulations do not permit Lombardi to supervise Bratkovics' work and such regulations authorized only Bratkovics to perform aircraft maintenance and approve the return of the aircraft to service after maintenance. Defendant's brief at 13. Accordingly, Defendants conclude that, pursuant to such Federal Aviation Regulations, only Bratkovics had the "right, duty or power to control the manner in which the work on the [decedent's] helicopter was to be performed." *Id.* Defendants also note that Bratkovics did not receive a W–2 form from Flight C, Flight C did not take taxes out of Bratkovics' pay, and Bratkovics received no employment benefits from Flight C. *Id.* at 50, 61–62.

¶ 27 Although the evidence Defendants cite would favor a finding that Bratkovics was an independent contractor, there was also evidence to support a finding that Bratkovics was an employee, thereby precluding entry of Defendants' Motion for Non–Suit/Directed Verdict. In summary, the evidence showed that Flight C was engaged in the business of helicopter maintenance and that Lombardi, as a corporate officer of Flight C, communicated with customers, assigned work to the mechanics, billed customers, paid mechanics by the hour, provided manuals and parts to the mechanics, stored the mechanics' tools, assisted with the work at times, and, most importantly, supervised and inspected the mechanics' work. Thus, viewing the evidence in the light most favorable to Plaintiff as the verdict winner, we conclude that the trial court did not err by denying Defendants' Motion for Non–Suit/Directed Verdict, because Plaintiff presented sufficient evidence upon which the jury could determine that Defendants employed Bratkovics and, thus, were vicariously liable for

Bratkovics' negligent maintenance of the decedent's helicopter. *See Johnson v. Glenn Sand and Gravel* 308 Pa.Super. 22, 453 A.2d 1048, 1050 (1982) (indicating master is liable for the torts of his servant if servant's tortious conduct was committed within the time and space of the employment and the servant's activity furthered employer's business in some way).

¶ 28 In their fourth issue, Defendants argue that the trial court erred by permitting the jury to determine Defendants' liability by applying a standard of care based on "industry custom," rather than the standard of care provided by the Federal Aviation Regulations (FARs). Defendants' brief at 22–24. Defendants cite *Abdullah v. American Airlines, Inc.,* 181 F.3d 363 (3d Cir.1999), for the proposition that the FARs preempt the entire field of aviation safety and, therefore, no state or territorial standard of care could be applied in the instant case. Defendants' brief at 23. However, this is the extent of Defendants' argument on this issue. Defendants fail to develop their argument by, for example, describing the standard of care provided by the FARs. Moreover, in *Abdullah,* the United States Court of Appeals for the Third Circuit stated:

> Even though we have found federal preemption of the standards of aviation safety, we still conclude that the traditional state and territorial law remedies continue to exist for violation of those standards. Federal preemption of the standards of care can coexist with state and territorial tort remedies.

*Id.* at 375. The Third Circuit further stated:

> [P]reemption should not be judged on the basis that the Federal Government has so completely occupied the field of safety that state remedies are foreclosed, but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law.

*Id.* (quoting *Silkwood v. Kerr–McGee Corp.,* 464 U.S.. 238, 256, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). In addition to failing to set forth what the standard of care would be pursuant to the FARs, Defendants overlook the above-quoted language from *Abdullah* and fail to describe whether the standard of care applied in the instant case, based on industry custom, comports with the standard provided by the FARs. It is quite possible that the standards are not in conflict and application of the industry custom standard did not frustrate the objectives of the federal law. If this is the case, the court did not err by instructing the jury on the industry custom standard. However, Defendants fail to address this aspect of the issue and instead baldly, and inaccurately, assert that the FARs completely preempt application of state standards. We refuse to develop Defendants' argument and conclude, therefore, that Defendants are not entitled to relief on this issue.[7] *See* Pa. R.A.P. 2119(a); *Wroblewski v. Commonwealth,* 570 Pa. 249, 809 A.2d 247, 252 (2002) (indicating appellant not entitled to relief where appellant failed to develop claim in any meaningful way).

---

7. Also within this issue, Defendants challenge the admissibility of certain testimony from Plaintiff's expert, Douglas Simpson, on the subject of industry customs and the "ultimate issue of negligence of the parties." Defendants' brief at 23–24. Defendants' argument, however, is not sufficiently developed and contains no citations to pertinent legal authority. Accordingly, Defendants' challenge to Plaintiff's expert's testimony is waived. *See* Pa.R.A.P. 2119(a); *Andaloro,* 799 A.2d at 82–83.

¶ 29 In their fifth issue, Defendants argue that the trial court erred by denying their Motion for Non–Suit/Directed Verdict and objections to certain points for charge on the issue of Lombardi's personal liability. Defendants' brief at 24–25. Defendants assert that only the corporation, Flight C, could be held vicariously liable for Bratkovics' negligent acts, and Lombardi was merely a corporate officer of Flight C who "was not personally engaged in active maintenance on [the decedent's] aircraft." *Id.* at 24. We find this issue to be meritorious.

¶ 30 In their complaint, Plaintiff averred that, immediately prior to the accident, Lombardi participated in replacing the single drive dual magneto in the powerplant of the decedent's helicopter. Complaint, 11/29/96, at ¶¶ 19, 23–26. Plaintiff did not seek to hold Lombardi personally liable by piercing the corporate veil, *i.e.,* Plaintiff neither challenged the legitimacy of Flight C as a corporation nor alleged that Lombardi used the corporate form merely as a vehicle in which to engage in illegal or improper acts. Rather, Plaintiff sought to hold Lombardi liable pursuant to the "participation theory" by alleging that Lombardi personally participated in the negligent maintenance of the decedent's helicopter. In *Brindley v. Woodland Vill. Rest., Inc.,* 438 Pa.Super. 385, 652 A.2d 865, 868 (1995), we explained the difference between liability imposed on a corporate officer by piercing the corporate veil and liability pursuant to the participation theory:

There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation. Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his.

Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

*Id.* (quoting *Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 470 A.2d 86, 89–90 (1983)). *See also Amabile v. Auto Kleen Car Wash,* 249 Pa.Super. 240, 376 A.2d 247, 252 (1977) ("The law of Pennsylvania has long recognized that personal liability can be found against a corporate officer who actually participates in the wrongful, injury-producing act.").

¶ 31 To impose liability on a corporate officer pursuant to the participation theory, a plaintiff must establish that the corporate officer engaged in misfeasance, *i.e.,* "the improper performance of an act." *Brindley,* 652 A.2d at 868. However, a corporate officer cannot be held personally liable for nonfeasance, *i.e.,* "the omission of an act which a person ought not to do." *Id.* As our Supreme Court explained in *Wicks:*

The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, not for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

*Id.* at 90 (citation omitted).

¶ 32 The following cases illustrate the distinction between misfeasance and non-

feasance. In *Loeffler v. McShane*, 372 Pa.Super. 442, 539 A.2d 876 (1988), we concluded that a corporate officer, who supervised the refinancing of a mortgage, could be held individually liable for the loss suffered by the mortgagors when the corporate officer negligently authorized payment of the mortgagors' settlement funds to the wrong party. In applying the participation theory in *Loeffler*, we distinguished misfeasance from nonfeasance, of which only the former can result in personal liability on a corporate officer:

> The trier of fact found that [the corporate officer] "specifically directed the particular act to be done" which resulted in the loss of the mortgagors' settlement funds. The record clearly supports an inference that [the corporate officer], without first obtaining the permission of either the mortgagor or the mortgagee, ordered his clerk to pay the settlement check to a party who was not authorized to receive the check. This active involvement in the misallocation of funds involved both misfeasance and negligence. The combination of the two is clearly sufficient to support a finding of personal liability on the part of a corporate officer.

*Id.* at 879. The corporate officer in *Loeffler* actively participated in the negligent act that resulted in the damage, *i.e.*, loss of the settlement funds.

¶ 33 In another case of misfeasance, *Bank of Landisburg v. Burruss*, 362 Pa.Super. 317, 524 A.2d 896 (1987), a bank/lender and a secured third-party brought an action for conversion against a livestock auctioneering company and its president, who sold a debtor/farmer's cattle (which served as collateral for the loan to the debtor/farmer) without obtaining permission for the sale from the secured third-party who had a security interest in the cattle. *Id.* at 897–98. The auctioneer-

ing company and its president paid the proceeds of the sale to the debtor/farmer, who promptly disappeared after receiving payment. *Id.* The bank/lender and secured party were granted summary judgment, which held the auctioneering company and its president jointly and severally liable for the conversion. *Id.* Although the president argued that he had no reason to believe the cattle were subject to a security interest, the trial court determined that this information could have been easily discovered because the secured third-party perfected his security interest by filing a financing statement with the county prothonotary. *Id.* at 900. Indeed, the president was held to be personally liable under a participation theory because of his involvement in the tortious act. Specifically, the president went to the debtor/farmer's house to negotiate the sale of the cattle, arranged delivery of the cattle to the auction, and neglected to search for the financing statement or at least delegate this task to someone else. Despite the president's claim of good faith on his part, we found that the president's "conduct involved a sufficient degree of participation in [the corporation's] tort to impose [personal] liability." *Id.* at 901.

¶ 34 Conversely, cases in which we found merely nonfeasance or a lack of evidence of misfeasance by corporate officers include *Brindley*, where the owners of a restaurant were sued in their individual capacities for injuries the plaintiff sustained from slipping on a puddle of water in the restaurant's bathroom. We concluded that the negligence alleged against the owners was akin to nonfeasance or "omitting to do something which ought to be done." *Id.* at 870. The owners "allegedly neglected their duty to clean and keep safe the restaurant's restroom. There was no evidence, however, that the condition existing in the restroom was a result of an active, knowing participation by [the own-

ers]." *Id.* We further noted that the participation theory is closely related to the theory of piercing the corporate veil, which is imposed cautiously and, in fact, there is a presumption against piercing the corporate veil. *Id.* Finally, we stated that to hold the restaurant owners personally liable "would serve to make the theory of the corporate entity useless." *Id.* Accordingly, we held that imposing liability upon the restaurant owners, jointly and severally with the restaurant, was error. *Id.*

¶ 35 In the instant case, Plaintiff points to no evidence indicative of Lombardi's personal participation in the tortious conduct, which both parties agree was Bratkovics' failure to properly install the magneto on the decedent's helicopter. Although Plaintiff points to evidence that Lombardi assisted Bratkovics at times, there was no evidence that Lombardi specifically assisted Bratkovics in installing the magneto. Plaintiff claims Lombardi "orchestrated the maintenance work to be done, discussed the maintenance work with the mechanics, and actually participated in some of the maintenance projects for Flight C customers." Plaintiff's Reply Brief at 3. Plaintiff also asserts that Lombardi "discussed maintenance issues with customers, actually did flight tests and ran-up engines, had discussions with the mechanics concerning the work to be done, had discussions with helicopter manufacturers as well as the FAA concerning the maintenance and would relay such maintenance to the mechanics, including Bratkovics, and would discuss the particular projects that the mechanics were working on, and then relay the status of the projects to Flight C customers." *Id.* None of Plaintiff's general assertions pertaining to the day-to-day supervisory and administrative acts of Lombardi relate to the particular maintenance work performed by Bratko-

vics that caused the crash of the decedent's helicopter.

¶ 36 With regard to the installation of the magneto by Bratkovics, Plaintiff merely avers that Lombardi was aware of such maintenance work and assisted the decedent in preparing his aircraft for flight without informing the decedent of the maintenance status of the aircraft. Plaintiff's Reply Brief at 4. Although Plaintiff states "Lombardi knew that Bratkovics had been working on the aircraft the day before, and knew that the aircraft had been left in an unairworthy condition," *id.,* Plaintiff's citation to the record does not support their averment that Lombardi knew the aircraft was unairworthy, but let the decedent take it anyway. Plaintiff argues:

> Lombardi clearly had a right to control and had a duty to control and indeed, could have controlled the situation at issue, both the maintenance aspects and the fatal flight in question. Lombardi knew that the work was not complete on the accident aircraft. Lombardi knew that [P]laintiff's decedent was planning to fly the aircraft on the day in question. Any reasonable person could foresee the result that occurred here. There is no basis to set aside the verdict and grant judgment in favor of Lombardi.

*Id.* at 22. Nothing in Plaintiff's argument or in the record indicates misfeasance on the part of Lombardi with regard to the negligent act in this case, *i.e.,* Bratkovics' negligent maintenance. Even though Lombardi prepared the decedent's helicopter for flight, Plaintiff alleges nothing about the actual preparation that would constitute negligence. At most, Lombardi engaged in acts of *nonfeasance* by, for example, failing to inspect the work done by Bratkovics. Acts of nonfeasance, however, cannot result in imposition of personal liability on a corporate officer. *Brind-*

*ley,* 652 A.2d at 868. Lombardi's lack of participation in the specific tortious conduct, *i.e.* improper installation of the magneto, compels us to conclude that he cannot be held personally liable. Accordingly, the trial court erred by failing to grant Defendants' Motion for Non–Suit/Directed Verdict insofar as it requested relief from liability on the part of Lombardi, individually.

¶ 37 Finally, Defendants assert that the trial court erred by granting delay damages. Defendants do not contest the calculation of delay damages, but instead argue that delay damages were improperly granted because Defendants, specifically Flight C and Lombardi, had no available assets to make a settlement offer that would have approximated Plaintiff's settlement demands. We first note that, because we have concluded that Lombardi cannot be held personally liable pursuant to the evidence presented in this case, he is likewise not liable for delay damages. Moreover, Bratkovics and PPCIGA are not parties to this appeal, so we will not consider their liability for delay damages. Thus, the remaining question is whether the trial court improperly imposed delay damages on Flight C. Based on the argument presented by Defendants, we conclude that the trial court did not err in this regard.

¶ 38 We recognize that an order imposing delay damages is interlocutory, but since judgment was entered prior to the notice of appeal being filed in this case, we have the authority to review the merits of this issue. *Overdorf v. Fonner,* 748 A.2d 682, 684 (Pa.Super.2000). Our scope of review is plenary, and we shall not reverse the court's decision to impose delay damages absent an abuse of discretion. *Id.; Goldberg ex rel. Goldberg v. Isdaner,* 780 A.2d 654, 659 (Pa.Super.2001).

¶ 39 Under Pa.R.C.P. 238, "a plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage" may seek delay damages "from each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, ... and [such delay damages] shall become part of the verdict, decision or award." Pa.R.C.P. 238(a)(1). The accrual of delay damages is tolled as described in Pa.R.C.P. 238(b):

(b)(1) The period of time for which damages for delay shall be calculated ... shall exclude the period of time, if any,

(i) after the defendant made a written offer which complied with the requirements of subdivision (b)(2), provided that the plaintiff obtained a recovery which did not exceed the amount described in subdivision (b)(3), or

(ii) during which the plaintiff caused delay of the trial.

\* \* \* \*

(2) The written offer of settlement required by subdivision (b)(1)(i) shall contain an express clause continuing the offer in effect for at least ninety days or until commencement of trial, whichever occurs first, and shall either

(i) be in a specified sum with prompt cash payment, or

(ii) contain a structured settlement plus any cash payment.

\* \* \* \*

(3) The plaintiff's recovery required by subdivision (b)(1)(i), whether by award, verdict or decision, exclusive of damages for delay, shall not be more than 125 percent of either the specified sum or the cost of the structured settlement plus any cash payment to the plaintiff.

Pa.R.C.P. 238(b). Accordingly, a defendant bears the burden of proof when op-

posing imposition of delay damages and may do so on two bases: (1) establishing that the requisite offer has been made in accordance with the terms of Pa.R.C.P. 238(b)(1)(i); or (2) establishing that the plaintiff was responsible for specified periods of delay. *Overdorf*, 748 A.2d at 685.

¶ 40 Herein, Defendants argue that they did not make a settlement offer because any such offer would have been certainly rejected by Plaintiff based on Plaintiff's purported history of large settlement demands and Defendants' inability to meet such demands. Specifically, and without any citations to the record, Defendants contend that Plaintiff demanded $2,000,000 for settlement in April of 1998 and then reduced her settlement demand to $1,500,000 by early 1999. Defendants' brief at 31. Defendants claim that, on April 9, 1999, Plaintiff further reduced her demand to $300,000, which is PPCIGA's statutory limit. *Id.* Defendants explain that they did not make a settlement offer because:

> such an offer, even if made for the purpose of avoiding damages for delay, would have been a fruitless exercise, and it would not have tolled the running of damages for delay, since a three hundred thousand ($300,000.00) dollar settlement offer, even if accompanied by whatever small amount of assets were available to the individual defendants, never would have been sufficient under Rule 238 to stop the running of damages for delay, in light of the multi-million verdict which was reached by the jury.

*Id.* at 32. Defendants also claim that Plaintiff's counsel "gave absolutely no indication that he would require, let alone be satisfied, with a personal contribution by the individual defendants." *Id.* at 36. Defendants claim that Flight C had no available assets available to it to satisfy a judgment, except for a 1973 Ford truck of

minimal value. *Id.* at 37. For these reasons, Defendant argues that "it would have been an exercise in futility for defendant to have offered any money, which they did not have in the first place, for the purpose of attempting to toll damages for delay under Rule 238." *Id.* at 38.

¶ 41 Defendants' argument is misguided. By presuming that a settlement offer would have been an "exercise in futility" because an offer of all assets available to Defendants would not have been enough to avoid imposition of delay damages pursuant to Rule 238(b)(1)(i), Defendants failed to recognize that:

> [w]e have modified the first basis found in Rule 238(b)(1) by declaring that a plaintiff shall not be awarded damages for delay after the date of the defendant's offer when the court determines that, because of the defendant's indigence, the offer was the full amount available for payment of the plaintiff's claim and it was impossible for the defendant to have offered more.

*Overdorf*, 748 A.2d at 685. To escape imposition of delay damages, even an indigent defendant "must offer all assets that he has available for payment." *Id.* Instead of doing so, Defendants claim to have proceeded on the basis that any offer they would have made would have been insufficient to toll the accrual of delay damages. By making an offer of all available assets, followed by a factual finding by the trial court that Defendants did indeed tender all assets available to them, Defendants could have avoided the imposition of delay damages, even if their offer did not approximate the verdict eventually rendered by the jury. *See id.* ("Whether defendant has tendered all that he has available is determined by the trial judge at an evidentiary hearing."). In failing to make any offer whatsoever, Defendants precluded any possibility of preventing the imposition

of delay damages pursuant to Rule 238(b)(1)(i). Accordingly, Defendants have failed to sustain their burden of showing they are entitled to relief on this basis.

¶ 42 For the foregoing reasons, we vacate that portion of the trial court's October 4, 2000 order insofar as it directs PPCIGA to pay any damages and insofar as it imposes personal liability upon Lombardi. The order is otherwise affirmed.

¶ 43 Judgment vacated in part, affirmed in part.