813 A.2d 650

James STRICKLER, Jr., a Minor, by James STRICKLER and Angela Strickler, His Parents and Natural Guardians, and James Strickler and Angela Strickler, in their own right, Appellants,

v.

Bharati DESAI, M.D., Appellee.

Pennsylvania Property and Casualty Insurance Guaranty Association, Intervenor.

Supreme Court of Pennsylvania.

Argued March 5, 2002.

Decided Dec. 31, 2002.

622

Thomas Hollander, Pittsburgh, for Strickler, et al.

Lise Luborsky, Philadelphia, for Pennsylvania Property and Casualty Insurance Guaranty Association

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

In this statutory interpretation case, the world of medical malpractice litigation is turned upside down. Counsel for James Strickler, Jr., ("James Jr.") the baby allegedly injured by the medical malpractice of Appellee, Bharati Desai, M.D. ("Dr. Desai") argues that the medical expenses of James Jr. were *not* caused by the malpractice of the doctor. The Pennsylvania Property and Casualty Insurance Guaranty Association (the "Association"), the statutory guarantor of Physicians Insurance Company ("PIC"), Dr. Desai's insurer, also makes an unusual argument. The insurer asserts that James Jr. and his parents ("Plaintiff–Appellants") should be held to their claim that the doctor caused James Jr. to incur $459,728.24 in medical expenses. What could cause the planets to become so misaligned? The short answer is Section 991.1817(a), the non-duplication of recovery provision of the Pennsylvania Property and Casualty Insurance Guaranty Association Act (the "Act"), 40 P.S. §§ 991.1801–1820.[1]

Although the positions of the parties are uncharacteristic of plaintiffs and defendants in medical malpractice actions, their contentions are consistent with their interests here, where Appellants seek to enforce a settlement agreement against the Association, and the Association claims that forcing it to fund the settlement would provide Appellants with a double recovery. Therefore, we are called upon to resolve the seemingly incongruous positions of the parties and determine whether

1. Act of May 17, 1921, P.L. 682, No. 284, art. XVIII, *as amended.*

the non-duplication of recovery provision of the Act entitles the Association to offset its statutory obligation by the amount of health care benefits previously received by Appellants from their health care provider, Aetna.

## Facts and Procedural History

On January 31, 1997, Appellants filed a complaint in the Court of Common Pleas of Westmorland County ("trial court") alleging that Dr. Desai had committed malpractice in her treatment of James Jr. Although the specific nature of the alleged malpractice is largely irrelevant to the issue currently before us, it does help explain why the parties decided to settle the case and it provides background to the instant dispute. We, therefore, review the facts of the underlying medical malpractice action before proceeding with a discussion of the non-duplication of recovery provision of the Act.

## The Underlying Medical Malpractice Action

Appellants allege that from the time that James Jr. was born on August 29, 1994, until he was eighteen months old, he exhibited symptoms consistent with neurological disorders. Specifically, at birth, his head was thirty-six point eight centimeters in circumference, a size that Appellants claimed was far in excess of normal. Appellants asserted that Dr. Desai should have been concerned about this and the continued growth of James Jr.'s head over the ensuing eighteen months, and should have determined its cause. Appellants contend that Dr. Desai at the very least should have realized that James Jr. was having neurological problems when, at fourteen months of age, he started to experience trembling in his legs and would not crawl or pull himself up as he had been doing. Appellants claim that Dr. Desai wrongly focused on ear infections as the cause of the child's problems and it was not until doctors at the Children's Hospital of Pittsburgh examined James Jr. on February 27, 1996, that it was determined that he was suffering from hydrocephalus [2] and a malignant brain

2. Hydrocephalus is "[a] condition marked by an excessive accumulation of fluid resulting in dilation of the cerebral ventricles and raised intracranial pressure; may also result in enlargement of the cranium

tumor, which had spread to the brain stem. Appellants claimed that, as a result of Dr. Desai's malpractice, James Jr. suffered, among other things, severe neurological damage, hydrocephalus, malignant tumor growth, physical and mental pain, and (most importantly to this case) medical expenses, which, at the time of the filing of the pretrial statement in March of 1999, were purported to be $459,728.24.

Dr. Desai saw things quite differently. Her experts were prepared to refute the allegations that she was negligent. Dr. Desai asserted that although James Jr.'s head was large, it was in proportion with his body. Furthermore, Dr. Desai claimed that the Appellants' experts did not rely on the most accurate growth chart to evaluate the head size of James Jr. Dr. Desai's experts referred to a chart developed by the federal government, which showed that James Jr.'s head was in the seventy-fifth percentile and not the ninety-eighth percentile as the experts for Appellants had asserted. Dr. Desai also contended that at the age of one year, a physical examination did not disclose any neurological problems and that on November 30, 1995, Dr. Desai noted her concern about the child and recorded that the child needed "close following." However, notwithstanding her request to see the child again in two weeks, James Jr. was not brought in to see Dr. Desai again until January 26, 1996, at which time she correctly started the process necessary for the February, 1996 admission of James Jr. to the Children's Hospital of Pittsburgh, where his problems were diagnosed.

## PIC Becomes Insolvent and the Parties Settle the Medical Malpractice Action

PIC, the insurer for Dr. Desai, became insolvent on January 21, 1998. (R. 96a, 119a). The Association thereby became obligated, subject to the terms of the Act, to pay covered claims[3] asserted against the PIC casualty insurance policy issued to Dr. Desai. 40 P.S. § 991.1801. Pursuant to Section

and atrophy of the brain." *Stedman's Medical Dictionary* 815 (26th ed.1995).

3. The General Assembly defined the term "covered claims" at 40 P.S. § 991.1802.

991.1803(b)(2), the Association also undertook the defense of Dr. Desai and the case proceeded. (R. 96a, 119a).

On August 26, 1999, in part, because Appellants had concerns about the strength of their case (R. 57a, ¶ 16), the parties entered into and requested that the trial court approve a settlement of the action. The settlement provided for a total payment to Appellants of $750,000.00. The Association agreed to pay $200,000.00 pursuant to and subject to the terms of the Act. The Pennsylvania Medical Professional Liability Catastrophe Loss Fund (the "CAT fund") agreed to pay the remaining $550,000.00.[4]

The settlement was complicated, however, by the fact that PIC had become insolvent during the pendency of the action. Although the Association agreed to assume the obligations of PIC, it expressly reserved its rights pursuant to 40 P.S. § 991.1817(a) to offset the amount it would have to pay against the funds Aetna previously paid Appellants. (R. 74a–75a). Aware that the Association had reserved its rights, the trial court approved the settlement. (R. 79a, 90a–92a).

### The Association Declines to Fund the Settlement and Asserts its Right to Offset Against Funds Paid to Appellants

On December 23, 1999, Appellants moved to compel the Association to fund the settlement. (R. 93a–99a). On February 2, 2000, the Association petitioned for, and the trial court granted it, leave to intervene. (R. 117a–121a, 131a). The Association refused to pay because it claimed that it was entitled to reduce the amount of its obligation by the amount Appellants received from Aetna. The Association explained that Appellants already received payment of medical expenses in excess of the amount that the Association was obligated to pay. (R. 127a). The Association reasoned that because Aetna had already reimbursed Appellants for the medical expenses they sought in the medical malpractice action, requiring the Association to make the $200,000.00 settlement payment would

---

4. The CAT fund has apparently complied with its settlement obligations to Appellants and is not the subject of this litigation.

result in duplicate payments to Appellants for the same expense, a result specifically prohibited by the non-duplication of recovery provisions of 40 P.S. § 991.1817(a). Tracking the words of the statute, the Association argued that any amount payable on a covered claim, including the current claim against the Association, must be reduced by the amount of the recovery from other insurance, which it argued should include the Aetna policy. (R. 127a). Because Aetna paid Appellants an amount greater than the amount the Association was required to pay pursuant to its statutory obligation to PIC, the Association claimed no additional payment was required. Specifically, the Association argued that the amount it would have had to pay was properly reduced to zero by the amount Aetna paid on behalf of Appellants.

Appellants disagreed. They argued that the amount of medical expenses would have been the same regardless of the medical malpractice because the treatment for the underlying condition and the malpractice injury were the same. (R. 98a, ¶ 13). In their petition for approval of the settlement agreement, Appellants summarized their position as follows:

[the Association] is not entitled to the offset because none of the medical expenses are recoverable in this action due to the fact that all of the medical treatment provided to minor plaintiff would have been required irrespective of the negligence of the defendant.

R. 82a, ¶ 5. Appellants attached to their motion to compel funding statements of medical experts supporting their contention that treatment for James Jr. would have been the same regardless of when Dr. Desai made the diagnosis. (R. 100a, 101a). Essentially, Appellants argued that because they could not have recovered the medical expenses they claimed in the medical malpractice action, the amount the settlement agreement required the Association to pay was not duplicative.

By Order dated February 29, 2000, the trial court agreed with the Association and denied the motion of Appellants to compel the Association to fund the settlement. Appellants appealed to the Superior Court. On January 19, 2001, the Superior Court affirmed the determination of the trial court.

*Strickler v. Desai,* 768 A.2d 862 (Pa.Super.2001). Appellants petitioned for leave to appeal, which we granted.

## Discussion

We begin with a discussion of the Act. The Act requires every insurer, as a condition of doing business in the Commonwealth, to participate in the Association. 40 P.S. § 991.1803(a). Subject to the requirements of the Act, the Association is obligated to pay covered claims of insolvent member insurers up to the amount of the policy limits of the insolvent insurer. 40 P.S. § 991.1803(b). The Association thereby "provide[s] a means for the payment of covered claims under certain property and casualty insurance policies ... [and] avoid[s] financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1). However, there are statutory limitations on when the Association is required to pay claims against its insolvent member insurers.

## The Non-duplication of Recovery Provision

■ In this case, we examine one of those limitations, 40 P.S. § 991.1817(a). Section 991.1817, entitled "Non-duplication of recovery," provides as follows:

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. **Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.**

40 P.S. § 991.1817(a) (emphasis added). The plain language of this provision entitles the Association to offset the insurance proceeds at issue here. Appellants' health insurance benefits are specifically enumerated in the Act as a type of insurance

benefit that a covered claim "shall be reduced by." Based upon this broad language, the Association may offset against the heath insurance benefits. Pursuant to the Statutory Construction Act, 1 Pa.C.S. § 1921(b), "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."

This Court recently addressed the question of whether the Association may offset its liability, arising out of its role as guarantor of PIC in medical malpractice actions, against prior payments of medical expenses made by health insurers. In fact, in *Bell v. Slezak*, 571 Pa. 333, 812 A.2d 566 (2002), we answered that question in the affirmative. We stated that the Association may:

> [O]ffset its obligation to pay the Bells' covered claim by "the amount of any recovery under other insurance," which the Bells received. Here, the Bells received payments in excess of $200,000 by their medical health insurer, Capital Blue Cross and Blue Shield. Thus, as the Bells received an amount greater than the limits of Dr. Slezak's insurance policy with PIC Insurance Group, which was $200,000, PPCIGA's obligation for payment on the Bells' covered claim was extinguished.

*Bell*, 571 A.2d at 346, 2002 WL 31840929, at *7.

In the instant case, the Association argues that amounts due pursuant to the settlement agreement are duplicative of the medical expense payments made by Aetna because Appellants demanded medical expenses in their complaint and because they admit that Aetna already paid them. In response, Appellants argue that because "medical expenses incurred in the treatment of [James Jr.] did not result from the [negligence of Dr. Desai] ... those costs are not part of this claim and the insurance benefits paid to cover those costs cannot lead to a duplication of recovery ..." Brief of Appellant p. 8.

■ However, the allegations in the complaint determine whether there is a claim for medical expenses, not the ability of counsel to obtain conflicting statements from his experts.

(*Compare* R. 27a *with* 100a).[5]   Here, it is clear that the trial court correctly found that Appellants demanded medical expenses in their complaint.   (R. 9a, 20a–21a;  Brief of Appellants p. 11–12).   The trial court observed that:

the Complaint filed by plaintiffs in Paragraph 10, in fact, alleges as damages medical, hospital and institutional care. Also, the pre-trial statement of the plaintiffs listed various medical and hospital expenses.

\*     \*     \*     \*     \*     \*

With this in mind, it is apparent that the medical expenses were a part of plaintiffs' claim against Dr. Desai. . . .

*Strickler v. Desai*, No 529/1997, slip op. at 5 (C.P.Pa.2000). Accordingly, the statement of Appellants that "[t]he healthcare insurance benefits paid for minor plaintiff's treatment are not elements of damages in this case . . ." (Brief of Appellants p. 15) is simply not true.   Based on the complaint and the pretrial statement, Appellants clearly requested medical expenses in the malpractice action.   We, therefore, agree with the conclusion of the trial court and the Superior Court that Appellants are constrained by their own pleadings and cannot now deny that the medical expenses they claimed were due to the malpractice of Dr. Desai.

It is also undisputed that Aetna paid Appellants medical expenses totaling $423,374.48.   (R. 56a, 82a ¶¶ 5–6;  Brief of Appellants at 6).   That amount is clearly greater than the

---

5.   On November 26, 1996, during the pendency of the medical malpractice action, the medical expert for Appellants wrote:

An earlier diagnosis would have led to earlier treatment.   Earlier treatment would certainly have found the tumor smaller and reduced the risk that the tumor poses which includes metastatic disease.   The delay in treatment has clearly made the amount of neurosurgery greater and more complicated and offer James Strickler the risk of increased harm.

R. 27a.   However, on August 23, 1999, in support of the motion to compel the Association to fund the settlement, the same expert for Appellants stated virtually the opposite.   There he explained that the medical treatment of James:

. . . would not have changed if the diagnosis of the brain tumor that James E. Strickler III[sic] was found to have had been made at an earlier date.

R. 100.

$200,000.00 settlement obligation of the Association. The parties settled all of their claims but did not specify the percentage of the settlement that was attributable to medical expenses. (R. 52a–58a, 74a–77a, 80a–86a, and 88a–92a). Because Appellants sought medical expenses in the complaint and settled all of the claims in the complaint, we deem the settlement to include amounts attributable to medical expenses.

Unfortunately, at this point, it would be impossible to determine what percentage of the settlement is attributable to medical expenses. Consequently, we cannot save Appellants from the shortcomings of their agreement with the Association. We can do no better for the parties than to hold that the amount that they received in settlement includes the amount they sought to receive in medical expenses. The alternative of remanding to a court to resolve the attribution issue would be an exercise in futility because, under the facts of this case, no court can look at the pre-existing settlement, which did not attribute between the many different types of damages sought by Appellants, and parcel out the portion of the settlement that corresponds to medical expenses.

We also note that the failure of the settlement agreement to explain what part of the settlement applied to medical expenses may not have been the fault of Appellants. Indeed, for there to be an agreement, the Association and Appellants would have had to agree on the amount of the settlement that was applicable to medical expenses. There is no way to force such an agreement. Appellants could have chosen to go to trial and sought a jury verdict allocating the amount of the award between the different types of damages they sought. However, to avoid the risk of a defense verdict, they reasonably chose to settle. Appellants, thereby, abandoned the possibility of an award that would state what we cannot, that the settlement did not provide any money for medical expenses.

As we explained in *Bethea v. Forbes*, 519 Pa. 422,

548 A.2d 1215 (1988),[6] the Act was intended "to give a measure of protection to policyholders and claimants who are faced with financial loss because of the insolvency of certain carriers of property and casualty insurance." *Id.* at 1216. It was not designed to pay all claims regardless of whether there are other sources of recovery. The Association is a source of "last resort." *Id.* at 1218. Member insurers pay assessments to the Association, derived from premiums of policyholders. 40 P.S. § 991.1808. Although Appellants correctly point out that a purpose of the fund is to provide a source of recovery of covered claims when an insurer becomes insolvent, the fund should be reserved to pay insureds of insolvent insurers who have not recovered the same damages from another source. The requirement that a previous insurance recovery reduce the amount owed by the Association serves to protect the limited fund, *see* 40 P.S. § 991.1808(d), from depletion when the insured has already obtained a recovery for the loss.

The Association is entitled to offset the amount of medical expenses Aetna paid from the amount of its liability. Although Appellants might like to withdraw their demand for medical expenses by arguing that they were never entitled to the damages they claimed, they are bound by their own assertions. They cannot now, based on the need to dispute that the medical expenses paid by Aetna were not duplicative, escape their own admission.

While Appellants might like the planets to realign, that is beyond the power of this Court. We affirm the determination of the Superior Court.

Justice EAKIN did not participate in the consideration or decision of this case.

Justice SAYLOR files a concurring opinion in which Mr. Justice NIGRO joins.

Justice CAPPY files a dissenting opinion.

---

**6.** *Bethea* held that an uninsured motorist settlement did not bar plaintiffs from proceeding against a tortfeasor pursuant to the Pennsylvania Insurance Guaranty Act, a predecessor to the Act. However, the language is applicable here.

Justice SAYLOR, concurring.

I concur in the result, as I find the Court's recent decision in *Bell v. Slezak*, 571 Pa. 333, 812 A.2d 566 (2002), controlling.

Justice NIGRO joins this concurring opinion.

Justice CAPPY, dissenting.

I respectfully dissent. I do not agree with the majority's determination that the claim for which Appellants seek payment from the Pennsylvania Property and Casualty Insurance Guaranty Association (the "Association") under the Pennsylvania Property and Casualty Insurance Guaranty Act (the "Act"), 40 P.S. §§ 991.1801–1820, is determined by the allegations in Appellants' complaint and as such, includes the medical expenses alleged as damages therein. To the contrary, I believe that Appellants' claim may be defined by the record that existed at the time this case settled, and as such, does not include those medical expenditures. Thus, I would conclude that pursuant to 40 P.S. § 991.1817(a), the Association is not entitled to offset the amount that Appellants received from Aetna, their health care insurer, to pay for the medical treatment James Strickler, Jr. ("James Jr.") received when his condition was diagnosed.

The record reveals the following. On January 31, 1997, Appellants filed a complaint against Dr. Bharati Desai for medical malpractice. In their Complaint, Appellants alleged that Dr. Desai negligently failed to recognize that James Jr. suffered from a malignant brain tumor, and that Dr. Desai's negligence caused James Jr. to suffer severe neurological damage, developmental delay, hydrocephalus, malignant tumor growth, and the increased likelihood of metastatic cancer. Appellants further alleged that the results of Dr. Desai's negligence included and will include expenses for James Jr.'s medical treatment, physical and mental pain, inconvenience, humiliation, impairment of earning powers, and loss of the pleasures of life.

In their Pretrial Statement, Appellants repeated these assertions. However, the expert report that Appellants filed with

the Pretrial Statement supporting Appellants' allegations of Dr. Desai's negligence and the nature of resulting harm to James Jr. did not opine specifically that a prompt diagnosis by Dr. Desai would have made a difference in the medical treatment James Jr. had received. Moreover, the reports filed by Dr. Desai's experts expressly opined that any delay in diagnosis did not adversely affect James Jr.'s recovery, prognosis, or medical treatment.

When the parties agreed to settle the case, Appellants filed their Petition for Preliminary Approval of Leave to Settle a Minor's Action. The reports from both Appellants' and Dr. Desai's respective medical experts, submitted with the Petition, opined that the medical treatment provided to James Jr. would have been the same no matter when the diagnosis of his brain tumor occurred.

Thus, despite the allegations in Appellants' Complaint, at the time of settlement, the record demonstrated that Dr. Desai was not legally liable for James Jr.'s incurred medical expenses. *See Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888, 892 (1990) ("A plaintiff is required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered."). Accordingly, Dr. Desai's medical malpractice insurer, Physicians Insurance Company ("PIC"), would not have been obligated to pay for those items. *See General Accident Ins. Co. of America v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997) (an insurer's duty to indemnify arises in the event of liability in the underlying action.).

Whether the Association is entitled to offset the amount Aetna paid to cover James Jr.'s medical expenses is a matter of statutory construction. The Act's offset provision states:

§ 991.1817. Non-duplication of recovery

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an

insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. *Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.*

40 P.S. § 991.1817(a) (emphasis added).

The term "covered claim" is defined in § 991.1802 of the Act, which provides in relevant part:

§ 991.1802. Definitions.

As used in this article, the following words and phrases shall have the meanings given to them in this section:

* * *

"Covered Claim."

(1) An unpaid claim ... submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article....

40 P.S. § 991.1802.

Further, under 40 P.S. § 991.1803(b)(1), the Association stands in the shoes of insolvent insurers.

According to the Act's offset provision, it is the "amount payable on a covered claim" that "shall be reduced by the amount of any recovery under other insurance." 40 P.S. § 991.1817(a). What constitutes the covered claim is, therefore, a central issue. Under the statutory definition in 40 P.S. § 991.1802, the covered claim in this case is the claim that was submitted to the Association to cover, in PIC's stead, the sum that settled Appellants' malpractice claim. Accordingly, to answer whether § 991.1817(a)'s offset applies, it must be determined whether any amount of the settlement sum, i.e., the covered claim, was recovered from Aetna. It is this inquiry which necessarily causes us to ask whether the medi-

cal expenses Appellants had incurred were part of the parties' settlement.

In my view, there are two plausible answers. The first is the answer the majority gives—the claim the parties settled is set forth in the allegations the Appellants asserted in their complaint. The second is the answer the majority rejects— the claim the parties settled is reflected in the record as developed at the time of settlement. While the former included the medical expenses, the latter demonstrated that it did not.

The Act does not state which answer is intended. Accordingly, the statute is ambiguous, and statutory interpretation is warranted. 1 Pa.C.S. § 1921(c); *O'Rourke v. Commonwealth,* 566 Pa. 161, 778 A.2d 1194, 1201 (2001) (citing *In re Kritz' Estate,* 387 Pa. 223, 127 A.2d 720, 723 (1956)) ("[R]ules of statutory construction are to be resorted to only when there is [patent or latent] ambiguity".).

The applicable rules of statutory construction are well-settled. The overriding principle is to ascertain and effectuate the intent of the legislature. 1 Pa.C.S. § 1921(a). When, as here, the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering the occasion and necessity for the statute, the object to be obtained, and the consequences of a particular interpretation. 1 Pa.C.S. §§ 1921(c)(1),(c)(4),(c)(6). The Act is to be liberally construed to effect its object and to promote justice. *See* 1 Pa.C.S. § 1928(c).

Generally speaking, the Act aims "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants and policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1).

In light of the Act's purposes and the Association's statutory role, I would not interpret the term "covered claim" as used in 40 P.S. § 991.1817(a) as necessarily limited to the allegations in Appellants' complaint. Rather, I would allow the record at

the time of settlement also to determine what items the covered claim encompasses. In this way, the Association would cover only that which PIC would have paid.[1]

As the record that existed at the time of settlement demonstrates that medical expenses were not legally recoverable, I would conclude that the covered claim in this case does not include James Jr.'s incurred medical expenses. I would, therefore, also conclude that Appellants did not recover any portion of the covered claim from other insurance under 40 P.S. § 991.1817(a). Accordingly, I would hold that the Association is not entitled to § 991.1817(a)'s offset.

---

1. Appellants indicate in their Brief that had they been able to recover the medical expenses, a settlement for $750,000 would likely not have been achievable, and that the likelihood of settlement increased when they recognized that this item of damages was unavailable. (Appellants' Brief at 11 & n. 1, 13). I agree with Appellants' observation that a decision to allow the offset here may have a chilling effect in the future on the settlement of cases in which the Association stands in for an insolvent insurer.