## Osborne v. Neville

C.P. of Lackawanna County, no. 92 CV 3102.

*James F. Mundy* and *Roger Mattes Jr.,* for plaintiff.
*John J. Aponick Jr.* and *Carl Greco,* for defendant Neville.
*John J. Aponick Jr.,* for defendant Surgical Group Inc.
*Lise Luborsky,* for PPCIGA.
*Zella Smith Anderson,* for the MCARE Fund, successor to the CAT Fund.

NEALON, *J.,* February 27, 2004—Defendants' petitions to stay or set aside the plaintiff's execution proceeding raise a troubling issue in malpractice litigation involving an insolvent insurer: Whether a health care provider may be personally liable for the amount of a malpractice judgment which is not paid by the Insurance Guaranty Association, the statutory excess coverage fund or an insurer or other collateral source? Pennsylvania common law has long held that a tort-feasor is personally liable for any judgment that is not paid by the applicable insurance. No provision in the statutes governing the Guaranty Association and the former Medical Professional Liability Catastrophe Loss Fund immunizes a health care provider from personal liability for any mal-

practice judgment that is not paid by those funds or some other collateral source, nor does either statute abrogate the existing common law recognizing such personal liability. Consequently, for the reasons set forth below, the defendants remain personally liable for the unfunded portion of the plaintiff's malpractice judgment and the defense petitions to stay or set aside the plaintiff's execution proceedings will be denied.

## I. FACTUAL BACKGROUND

On May 30, 1990, defendant Edwin C. Neville performed a saphenous vein stripping procedure on plaintiff James J. Osborne, for treatment of varicose veins in his left leg. During this surgery, Dr. Neville negligently severed and occluded the common femoral vein, rather than the saphenous vein, which caused his 26-year-old patient to sustain irreparable circulation damage to his leg and suffer permanent pain and disability. On May 29, 1992, Osborne's original counsel filed a malpractice action against Dr. Neville and his professional corporation, the Surgical Group Inc. See *Osborne v. Neville,* 102 Lacka. Jur. 132, 134-35 (2000).

At the time of Osborne's surgery, Dr. Neville maintained $200,000 in primary insurance coverage through Physicians Insurance Co. (PIC) as per section 701(a) of the Health Care Services Malpractice Act (HCSMA), Act of October 15, 1975, P.L. 390, no. 111, as amended, 40 P.S. §1301.701(a) (repealed by Act of March 20, 2002, P.L. 154, no. 13, §5104(a)). PIC provided separate "corporate coverage" to the Surgical Group with primary liability limits of $200,000. (See dkt. entry no. 145, exhibit A, p. 2.) Dr. Neville also maintained an additional

$1,000,000 in excess coverage through the Medical Professional Liability Catastrophe Loss (CAT) fund in accordance with section 701 of the former HCSMA.[1] Regrettably, PIC became insolvent on January 21, 1998, such that the Pennsylvania Property & Casualty Insurance Guaranty Association (PPCIGA) assumed coverage for Osborne's malpractice claim to the extent that it was covered by the PIC policies. See *Strickler v. Desai,* 571 Pa. 621, 625-26, 813 A.2d 650, 652-53 (2002).

Prior to trial, Osborne and his trial counsel offered to settle this malpractice action for the sum of $100,000 and Dr. Neville provided his consent to PPCIGA to settle this case for that amount. Despite the recommendation by Dr. Neville's counsel that PPCIGA tender $100,000 in settlement, the maximum offer made by PPCIGA was $75,000, and as a consequence, this matter proceeded to trial. Because of the clear negligence on his part, Dr. Neville was unable to secure the services of an expert witness in his defense and did not offer any expert testimony at trial. In response to special interrogatories, Dr. Neville and the Surgical Group were both found liable and the jury awarded Osborne $730,500 in damages. See *Osborne,* 102 Lacka. Jur. at 138-39.

Dr. Neville and the Surgical Group filed a joint motion for post-trial relief whereas Osborne presented a

---

1. The HCSMA was amended by the Act of November 26, 1996, P.L. 776, no. 135 (Act 135), to increase the required policy limits for primary insurance coverage and to change the procedures and coverage limits for the CAT fund. Act 135 was subsequently amended by the Act of March 20, 2002, P.L. 154, no. 13, which repealed the HCSMA and supplanted it with the Medical Care Availability and Reduction of Error (MCARE) Act, 40 P.S. §1303.101 et seq. The MCARE Act established the Medical Care Availability and Reduction of Error (MCARE) fund to replace the CAT fund. See 40 P.S. §1303.712.

motion for delay damages under Pa.R.C.P. 238. By memorandum and order dated September 26, 2000, the jury verdict was remitted to $728,000 to reflect a reduction in the award for past loss of income, but in all other respects, the defense post-trial motion was denied. Delay damages were awarded to Osborne in the amount of $382,211.42, and a molded judgment of $1,110,211.42 was entered in his favor. *Id.* at 166-67. The judgment was later affirmed by the Superior Court of Pennsylvania on January 18, 2002, see *Osborne v. Neville,* 797 A.2d 381 (Pa. Super. 2002), and the defense petition for allowance of appeal was denied by the Supreme Court of Pennsylvania on July 9, 2002. See *Osborne v. Neville,* 569 Pa. 694, 803 A.2d 735 (2002).

From the date of the entry of judgment on September 26, 2000, until the time of the Supreme Court order of July 9, 2002, post-judgment interest of $116,572.19 accrued on the original judgment of $1,110,211.42, thereby resulting in an aggregate verdict of $1,226,783.61. By letter dated July 18, 2002, PPCIGA forwarded checks to Osborne's counsel in the amount of $200,000 and $26,783.61 ostensibly representing its payment under the dual coverages afforded to Dr. Neville and the Surgical Group. On August 23, 2002, the CAT fund advised Osborne's counsel that it would contribute $944,052 toward payment of the total judgment on December 31, 2002.[2] Hence, the combined payments by PPCIGA and

2. Section 701(e)(8) of the HCSMA governed payment of claims by the fund and stated that "[a]ll such claims shall be paid on or before December 31 following the August 31 by which they became final, as provided above." 40 P.S. §1301.701(e)(8) (repealed). An identical provision was contained in an earlier version of the HCSMA, see 40 P.S. §1301.701(e)(2) (repealed), which the Supreme Court interpreted as

the CAT fund totaling $1,170,835.61 resulted in $55,948 of the judgment being unfunded. (Dkt. entry no. 143, pp. 2-3.)

The unpaid judgment continued to accrue six percent post-judgment interest pursuant to 42 Pa.C.S. §8101 and on May 16, 2003, Osborne's collection counsel filed a praecipe for writ of execution against Dr. Neville and the Surgical Group in the amount of $84,718.56. Dr. Neville and the Surgical Group have filed a motion to set aside the execution, or in the alternative, to stay the execution proceeding. (*Id.,* nos. 134-142.) On December 16, 2003, PPCIGA and the CAT fund were directed to file amicus curiae briefs addressing their failure to pay the entire judgment entered against Dr. Neville and the Surgical Group. On January 7, 2004, PPCIGA and the CAT fund submitted their legal memoranda and following the completion of oral argument, this matter became ripe for disposition. (*Id.,* nos. 145-146.)

PPCIGA argues that it "paid the $200,000 policy limit of Dr. Neville's policy issued by the insolvent insurer PIC" and "also paid $26,783.61 under the corporate coverage . . . for the corporation, Surgical Group Inc." (Dkt. entry no. 145, p. 1.) PPCIGA's exhibits reflect that the Surgical Group's policy with PIC contained an "other insurance" clause which made the corporate coverage excess to Dr. Neville's individual liability insurance *and* his CAT fund coverage. (*Id.,* pp. 10-11, exhibit A, p. 5.) Thus, PPCIGA asserts that it "paid $26,783.61 under the

---

not requiring the fund to wait until December 31 to pay malpractice judgments. See *King v. Boettcher,* 537 Pa. 574, 578-79 n.3, 645 A.2d 219, 221 n.3 (1994) ("It is entirely possible, pursuant to this language, that the fund could pay its liabilities *before* December 31 of each year, thereby avoiding post-judgment interest.").

corporate coverage" because it had "mistakenly assumed" that the "CAT fund would pay $1 million" to satisfy the total judgment of $1,226,783.61. (*Id.,* p. 1.) Although PPCIGA now avers that it "should have paid only $200,000" since the CAT fund never exhausted its $1,000,000 in coverage for Dr. Neville, it "is not requesting a refund" based upon PIC's "other insurance" provision. (*Id.,* p. 2.)

The CAT fund submits that its payment of $944,052 represents its indemnity portion ($528,000) of the $728,000 verdict ($728,000 - $200,000 PPCIGA payment = $528,000) and its proportionate share of delay damages ($279,014) and post-judgment interest ($137,038) on that indemnity amount. According to the CAT fund, the unpaid shortfall of $84,718.56 is attributable to delay damages and post judgment interest which have not been paid by PPCIGA under the basic insurance coverage. The CAT fund argues that it has fully satisfied its statutory obligation and "is not required to pay Osborne the delay damages and post-judgment interest attributable solely to PIC's, now the Guaranty Association's, liability." (*Id.,* no. 147, p. 4.)

Dr. Neville contends that the writ of execution should be set aside since he secured the requisite primary insurance and CAT fund coverage for Osborne's claim and the unfunded judgment of $84,718.56 "would have been paid on his behalf if his insurance carrier remained solvent." (*Id.,* no. 136, p. 5.) Dr. Neville asserts that it is improper "to allow execution on his assets where he had a viable, legal policy of insurance at the time of Mr. Osborne's surgery and where PIGA or the MCARE fund may be responsible for payment of the judgment." (*Id.,* p. 7.) Osborne counters that no provision in the PPCIGA

statute or the HCSMA insulates a tort-feasor from personal liability for any excess judgment which is not paid by PPCIGA, the CAT fund or an insurer. Osborne maintains that only the legislature may create such an exemption from execution and that in the interim, the court should interpret the applicable statutes as written and allow him to proceed forward with his execution efforts. (*Id.,* no. 144, pp. 2-3.)

## II. DISCUSSION

### (A) *Relief From Execution*

Dr. Neville seeks to stay the execution pursuant to Pa.R.C.P. 3121(b)(2) which provides that an "[e]xecution may be stayed by the court as to all or any part of the property of the defendant upon its motion . . . showing . . . any other legal or equitable ground therefore." The grant or denial of a stay of execution is within the sound discretion of the trial court whose decision will not be disturbed absent a clear abuse of that discretion. *Keller v. Re/Max Centre Realty,* 719 A.2d 369, 371 (Pa. Super. 1998). As a general rule, a court "will not disrupt the rights of creditors to collect judgments." *Commonwealth Bank, A Division of Meridian Bank v. Iorio,* 451 Pa. Super. 330, 349, 679 A.2d 820, 830 (1996). Rather, the court "should not stay an execution unless the facts warrant an exercise of judicial discretion." *Keller, supra; Kronz v. Kronz,* 393 Pa. Super. 227, 233, 574 A.2d 91, 94 (1990). A proper exercise of this discretionary authority "entails a balancing of the rights of the debtor and creditor." *Kronz, supra.* However, "[w]hilst the power to stay execution of a judgment is necessary to prevent injustice,

it should never be exercised unless the case is plain, and the equity of the party asking the interposition of the court is free from doubt or difficulty." *Chestnut v. Pediatric Homecare of America Inc.,* 420 Pa. Super. 598, 601, 617 A.2d 347, 349 (1992) (quoting *Pennsylvania Company for Insurances v. Scott,* 329 Pa. 534, 549, 198 A. 115, 122 (1938)).

Dr. Neville alternatively seeks to set aside the writ of execution under Pa.R.C.P. 3121(d)(3) which empowers a court to take such action "upon any other legal or equitable grounds therefor." Once again, it is incumbent upon the debtor to provide a cognizable legal or equitable basis for setting aside the writ of execution. Compare *Unity Mutual Life Insurance Co. v. DiDomenico,* 274 Pa. Super. 263, 265, 418 A.2d 397, 398-99 (1980) (averment that insurance proceeds were not subject to attachment because they were entireties property of insured and his wife was insufficient to support setting aside a writ of execution); *Fleming v. Quaid,* 204 Pa. Super. 19, 22, 201 A.2d 252, 255 (1964) (mere allegation that the property attached does not belong to the judgment debtor furnishes no legal or equitable ground for setting aside a writ of attachment) and *Gulf Mortgage and Realty Investments v. Alten,* 286 Pa. Super. 253, 259, 428 A.2d 978, 981 (1981) (seizure of bank accounts without prior notice or hearing violated depositor's constitutionally protected right of procedural due process and provided basis for setting aside the writ under Rule 3121(d)(3)). When considering a petition to set aside an execution, the court should be mindful that "[i]n a system centered around the judicial resolution of disputes, the right to execution must occupy a cherished position." *Patterson v. Hopkins,* 247 Pa. Super. 163, 170, 371 A.2d 1378, 1381 (1977)

(cautioning that the court "must be careful to prevent overly technical interferences with the execution process and a resultant elevation of form over substance."). See also, 8 Goodrich-Amram 2d §3121(d):5.

### (B) *Tort-feasor Liability for Uninsured Judgment*

Since the disposition of Dr. Neville's petition to set aside or stay the execution is dependent upon the interpretation of the Insurance Guaranty Association (IGA) Act and the HCSMA, a brief analysis of those two statutes is necessary. PIGA was created by the Pennsylvania Insurance Guaranty Association Act, Act of November 25, 1970, P.L. 716, no. 232, as amended, 40 P.S. §§1701.101-1701.605 (superseded), which was later repealed and replaced by the Act of December 12, 1994, P.L. 1005, no. 137 §1, as amended, 40 P.S. §§991.1801-991.1820, that created its successor, the PPCIGA. See *Bell v. Slezak,* 571 Pa. 333, 336 n.2, 812 A.2d 566, 567 n.2 (2002). The IGA Act established the Guaranty Association to provide "a safety-net for insurance claims when the insurance carrier becomes insolvent" by stepping "into the shoes of the insolvent carrier" and acting as "a 'last resort' remedy for 'covered claims.'" *Sotack v. Pennsylvania Property & Casualty Insurance Guaranty Association,* 104 F. Supp.2d 471, 474 (E.D. Pa. 2000). The express purpose of the Act is "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. §991.1801(1). PPCIGA "is funded by assessing a fee against all member insurers, and every insurer is required to be a member as a

condition of its authority to write property and casualty policies" in Pennsylvania. *Bell,* 571 Pa. at 347, 812 A.2d at 574 (citing 40 P.S. §§991.1803(a), (b)(3), and 991.1808).

Once an insurer becomes insolvent, PPCIGA is "deemed the insurer to the extent of its obligations on the covered claims and, to such extent, shall have all rights, duties and obligations of the insolvent insurer as if that insurer had not become insolvent." 40 P.S. §991.1803(b)(2). The only exceptions to PPCIGA's assumption of the insolvent insurer's duties are: (1) PPCIGA's maximum statutory obligation is $300,000 per payment, regardless of the amount of the insolvent insurer's coverage limits in its policy (40 P.S. §991.1803(b)(1)(B)); and (2) any amount payable by PPCIGA on a covered claim is reduced or offset by any payments that the plaintiff has received from other insurance (40 P.S. §991.1817(a)). In all other respects, PPCIGA "is placed in the stead of the insolvent insurer, with all of that insurer's rights and duties and obligations," *Donegal Mutual Insurance Co. v. Long,* 528 Pa. 295, 300-301, 597 A.2d 1124, 1127 (1991), including the duty under 40 P.S. §991.1803(b)(4) to investigate, compromise, settle and pay covered claims. See *Hall v. MPH Transportation Inc.,* 58 D.&C.4th 482, 495 (Lacka. Cty. 2002).

The CAT fund was established by the HCSMA as a statutory excess insurer for a health care provider's liability which exceeds its primary insurance coverage in effect at the time of an occurrence. See *Pennsylvania Medical Society Liability Insurance Co. v. Commonwealth Medical Professional Liability Catastrophe Loss Fund,* 842 A.2d 379, 380 (Pa. 2004); *Elliott-Reese v.*

*Medical Professional Liability Catastrophe Loss Fund,* 805 A.2d 1253, 1254 n.1 (Pa. Commw. 2002), *aff'd per curiam,* 574 Pa. 705, 833 A.2d 138 (2003). The CAT fund "serve[d] the dual governmental function of providing reasonably priced professional malpractice insurance to Commonwealth health care providers and insuring that injured persons will obtain prompt and fair compensation for their claims." *DeVeaux v. Palmer,* 125 Pa. Commw. 631, 636, 558 A.2d 166, 168 (1989). To finance the fund, all health care providers were assessed an annual surcharge based upon their primary insurance premium. *Milton S. Hershey Medical Center v. Commonwealth Medical Professional Liability Catastrophe Loss Fund,* 573 Pa. 74, 79, 821 A.2d 1205, 1208 (2003). At the time of Osborne's surgery, the CAT fund provided an additional $1,000,000 in coverage above Dr. Neville's basic coverage of $200,000. See 40 P.S. §1301.701(d) (repealed). With respect to the fund's responsibility for interest on awards, section 702(j) of the HCSMA was amended in 1996 to state that "[d]elay damages and post-judgment interest *applicable to the [CAT fund's] liability* in a case shall be paid by the fund and shall not be charged against the insured annual aggregate limits." *Walsh v. Medical Professional Liability Catastrophe Loss Fund,* 838 A.2d 692, 695 n.8 (Pa. 2003). (emphasis in original)

Because of the foregoing statutory framework relating to the payment of pre- and post-judgment interest, and PPCIGA's interpretation of the "other insurance" provision in the Surgical Group's corporate coverage policy, there is an accruing shortfall in the funding of Osborne's judgment by PPCIGA and the CAT fund. Relying upon the above-quoted language of 40 P.S.

§1301.702(j) (repealed) which was in effect at the time of Osborne's verdict, the CAT fund contends that it is liable for payment of delay damages and post-judgment based solely upon its proportionate share of the verdict. See *Walsh,* 838 A.2d at 699-700 (CAT fund was not liable for post-judgment interest on entire judgment, but rather was responsible only for interest on its pro rata share of the verdict); *Elliott-Reese,* 805 A.2d at 1258 (CAT fund responsible only for its proportionate share of delay damages and post-judgment interest as they relate to its excess coverage). Conversely, PPCIGA posits that once it paid PIC's $200,000 limit applicable to Dr. Neville, it was not required to make any additional payments under the Surgical Group's corporate coverage until the CAT fund had exhausted its entire $1,000,000 in coverage for Dr. Neville. Cf. *Milton S. Hershey Medical Center,* 573 Pa. at 86, 821 A.2d at 1213 ("Where, as here, the insurance coverage for the physicians was sufficient to satisfy the claims, their coverage should finance the settlement; there is no reason to utilize the insurance coverage of the vicariously liable hospital."). Since neither PPCIGA nor the CAT fund has intervened as a party in this action, we do not have the authority to decide whether PPCIGA or the CAT fund is responsible for the payment of Osborne's unpaid judgment. See *Shay v. Flight C Helicopter Services Inc.,* 822 A.2d 1, 11 (Pa. Super. 2003) (vacating trial court order directing PPCIGA to pay judgment, including delay damages, "because PPCIGA is not a party in this case, nor did any party in the underlying action file a declaratory judgment action against PPCIGA or otherwise seek to assert rights against PPCIGA."). Nevertheless, the question remains whether a malpractice victim may seek to recover directly from

the tort-feasor for a judgment which has not been paid by PPCIGA, the CAT fund or any other insurance or collateral source.

Pennsylvania tort law has long recognized that "the tort-feasor is liable for all injury caused by his negligence" and that "[i]t is also a fundamental, general principle that a plaintiff in such an action is entitled to compensation from the tort-feasor to the full extent of the injury sustained." *Bethea v. Forbes,* 519 Pa. 422, 426, 548 A.2d 1215, 1217 (1988) (citing *Incollingo v. Ewing,* 444 Pa. 299, 307, 282 A.2d 206, 228 (1971)). It is equally well established under our common law that the tort-feasor is personally liable for any judgment in excess of the applicable insurance policy limits, *Cowden v. Aetna Casualty & Surety Co.,* 389 Pa. 459, 476, 134 A.2d 223, 227 (1957), or the maximum CAT fund coverage. *Finkbiner v. Medical Professional Liability Catastrophe Loss Fund,* 119 Pa. Commw. 243, 246, 546 A.2d 1327, 1328 (1988), *aff'd,* 523 Pa. 101, 565 A.2d 157 (1989) (noting that since the total judgment exceeded the CAT fund coverage, "Dr. Mauriello remains liable to the Finkbiners for approximately $950,000 for the jury verdict and another $600,000 in delay damages imposed by the judge."). No provision in the IGA Act or HCSMA states or infers that an insured is immune from personal liability for any unfunded judgment, nor does either statute expressly abrogate the existing common law recognizing such personal liability on the part of a tort-feasor. See *Birth Center v. St. Paul Companies Inc.,* 567 Pa. 386, 402-403, 787 A.2d 376, 386-87 (2001) (holding that since the bad faith statute does not reference the common law or explicitly reject it, "the common law remedy survives."); *Metropolitan Property & Liability Insurance*

*Co. v. Insurance Commissioner of Pennsylvania,* 525 Pa. 306, 310, 580 A.2d 300, 302 (1990) (statute cannot be interpreted as abrogating common law by implication and instead "[t]he legislature must affirmatively repeal existing law or specifically preempt accepted common law for prior law to be disregarded.").

Dr. Neville cites *Panea v. Isdaner,* 773 A.2d 782 (Pa. Super. 2001), *aff'd sub nom., Bell v. Slezak,* 571 Pa. 333, 812 A.2d 566 (2002) for the proposition that he is protected from personal liability for Osborne's uninsured judgment, but a closer reading of that decision reveals that it is inapplicable to the issue at hand. In *Panea,* the plaintiffs sought to recover from the insured of an insolvent insurer for medical expenses which had been paid by the plaintiffs' health insurance carrier and later deducted from the plaintiffs' settlement payment pursuant to the non-duplication of recovery provision in 40 P.S. §991.1817. Since the plaintiffs had already received those proceeds from a collateral source and the health insurance carrier could not assert a subrogation claim against the plaintiffs or PPCIGA, the *Panea* court reasoned that the tort victims were "in the same position they would have been in had there been no insolvency." *Panea,* 773 A.2d at 792. Therefore, inasmuch as the plaintiffs had already been made whole for their losses by virtue of the payments made by PPCIGA and the plaintiffs' own health insurer, the court concluded that the plaintiffs could not recover those unsubrogated payments directly from the insured as well. *Id.* at 791 ("In each of the three cases under consideration the plaintiffs will receive the full amount of either their settlements or jury verdict, it just will not necessarily come from PPCIGA or the doctors."). Compare *Fetters v. Pennsylvania Property & Casualty*

*Insurance Guaranty Association,* 804 A.2d 126, 130 n.12 (Pa. Commw. 2002) (observing that although the *Panea* court precluded "a claimant from seeking to collect the amount of any offset from the tort-feasor personally," "[t]his court has not addressed the issue, and we need not decide it here.").

However, the *Panea* court did not address the issue of whether an insured of an insolvent insurer may be held personally responsible for the amount of a verdict which is not paid by PPCIGA, the CAT fund or some collateral source. Indeed, the *Panea* court expressly stated:

"We are not here presented with a situation where the settlement or jury damage award exceeds the insolvent insurer's policy limits or PPCIGA's liability cap. Thus, we will not address the question of whether a defendant can be held personally liable for the amount exceeding the policy limits or statutory cap." *Id.* at 792-93. (footnotes omitted)

At least one appellate court has indicated in obiter dictum that the plaintiff may recover any unfunded amount directly from the defendant, and has remarked:

"Although instantly, [plaintiff's] damages were less than PIGA's statutory limit of liability, we note that if his damage award had been in excess of the $300,000 cap, then he could have collected directly from [the tort-feasors] the amount which exceeded the statutory cap. Such a ruling would promote the common-law rule that the tort-feasor is liable for the full extent of damage caused by his negligence, while at the same time insuring that the public policy underlying PIGA is enforced." *Burke v. Valley Lines Inc.,* 421 Pa. Super. 362, 370 n.5, 617 A.2d 1335, 1339 n.5 (1992).

The double recovery concerns which served as the basis for the *Panea* ruling simply are not present in the case sub judice. Unlike the plaintiffs in *Panea,* Osborne is not attempting to recover from the tort-feasor for damages which were previously paid by a collateral source and subsequently deducted from the malpractice verdict pursuant to 40 P.S. §991.1817. Rather, he is seeking to be made whole for his loss by recovering that amount of his malpractice judgment which has not been paid by PPCIGA, the CAT fund or any other insurer or person. To date, no insurer, statutory fund or other collateral source has paid the $84,718.56 shortfall in Osborne's malpractice judgment, and for that reason, *Panea* is clearly distinguishable.[3]

---

3. Dr. Neville's reliance upon *Tominello v. Janeway,* 392 Pa. Super. 404, 573 A.2d 218 (1990) is likewise misplaced. In *Tominello,* a plaintiff sought to execute on the personal assets of an insured physician in order to collect immediately on a malpractice judgment that the CAT fund did not intend to pay until December 31. (See n.2, *supra.*) The Superior Court concluded that since the plaintiffs' judgment would eventually be paid in full by the CAT fund, the plaintiffs could not execute on the assets of the physician, but could instead institute a garnishment proceeding against the CAT fund until it paid the judgment. *Tominello,* 392 Pa. Super. at 409, 573 A.2d at 220-21 ("An individual doctor's expectation that personal assets are secure in return for paying the premiums required, *(provided that liability falls within the statutory limits set by the Act),* would be unfairly undermined if, because of a necessary administrative procedure, successful plaintiffs could execute on the assets of a health care provider, when plaintiffs failed to receive immediate payment of the judgment owed by the CAT fund."). (emphasis added) Instantly, Osborne's full judgment has not, and will not, be paid by the CAT fund, PPCIGA or any other insurer. In light of the *Tominello* court's parenthetical proviso that the doctor's expectation of protection from execution is applicable "provided that liability falls within the statutory limits set by the Act," *Tominello* does not govern the case at bar where Dr. Neville's liability purportedly exceeds the statutory limits of the HCSMA and IGA Act.

Resolution of the parties' dispute in this case must begin and end with the plain language of the IGA Act and HCSMA. See *Price v. Pennsylvania Property and Casualty Insurance Guaranty Association,* 795 A.2d 407, 412 (Pa. Super. 2002) (when interpreting the IGA Act, "the court must begin with the plain meaning of the language used in the statute."), *appeal denied,* 573 Pa. 698, 825 A.2d 1262 (2003). Nothing contained in the IGA Act or HCSMA bestows immunity upon a health care provider for any portion of a malpractice judgment that is not paid by PPCIGA, the CAT fund or some other collateral source. Nor does any provision in either statute reflect a clear intent to abrogate the long established common-law principle that a tort-feasor is personally liable for any excess judgment that is not paid by an insurer or statutory fund. Cf. *T.B. v. L.R. M.,* 567 Pa. 222, 231, 786 A.2d 913, 918 (2001) ("The mere fact that the statute does not reference the [common-law] doctrine cannot act to repeal by implication what has been entrenched in our common law."). One of the stated purposes of the IGA statute is "to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer," 40 P.S. §991.1801(1), and the denial of Dr. Neville's petitions to stay or set aside execution will avoid financial loss to Osborne but not to Dr. Neville. Nevertheless, the primary goal of that statute is to place the claimant and insured in the same position that they would have enjoyed in the absence of insolvency, *Panea,* 773 A.2d at 791, and it is clear under our common law that if PIC had not become insolvent, Dr. Neville would have remained personally liable for any portion of Osborne's malpractice award which was not paid by PIC and the CAT fund. See *Finkbiner, supra.* In light of the

clear and unambiguous language employed in the relevant statutes, see 1 Pa.C.S. §1921(b), the IGA Act and HCSMA cannot be construed as granting a health care provider immunity from personal liability for that amount of a malpractice judgment which is not paid by PPCIGA, the CAT fund or another insurer. See *In re Rodriguez,* 2003 WL 22208117, *3 (Pa. 2003) (since statute expressed no clear intent to repeal or preempt the common law, it would be interpreted as having retained the common-law principle).

If insureds of insolvent malpractice insurers are to be afforded immunity from personal liability for unfunded judgments, only the legislature can grant that immunity by amending the IGA Act or HCSMA to alter the existing common law. See *King,* 537 Pa. at 580, 645 A.2d at 222 ("It is possible that the legislature did not intend the CAT fund to pay post-judgment interest, and if that is the case, the legislature has the power expressly to exempt the fund from the payment of post-judgment interest as it sees fit."). To some extent, Dr. Neville has been a victim of PIC's insolvency and PPCIGA's inexplicable failure to settle this clear liability malpractice claim for $100,000 in accordance with Dr. Neville's wishes and his trial counsel's recommendation. If a private insurer had handled this malpractice claim in the manner that PPCIGA did, that insurer arguably would be liable to Dr. Neville for payment of the excess verdict, see *Cowden, supra,* as well as foreseeable compensatory damages, see *Birth Center,* 567 Pa. at 401-403, 787 A.2d at 385-86, and punitive damages. See 42 Pa.C.S. §8371. However, because PPCIGA is not regarded as an "insurer" for purposes of bad faith liability, it does not possess the same duties and obligations as the insolvent in-

surer in that regard and cannot be held liable for its bad faith conduct. See *T & N PLC v. Pennsylvania Insurance Guaranty Association,* 800 F. Supp. 1259, 1264-65 (E.D. Pa. 1992) (PIGA not liable for bad faith damages under 42 Pa.C.S. §8371); *Schreffler v. Pennsylvania Insurance Guaranty Association,* 402 Pa. Super. 309, 313, 586 A.2d 983, 985 (1991), *appeal denied,* 528 Pa. 644, 600 A.2d 196 (1991) (finding that there is no cause of action against PPCIGA "for bad faith failure to settle since settlement is a power conferred upon PIGA under the terms of the [IGA] Act."). Accord *Pennsylvania Medical Society Liability Insurance Co. v. Commonwealth, Medical Professional Liability Catastrophe Loss Fund,* 804 A.2d 1267, 1271 (Pa. Commw. 2002), *rev'd on other grounds,* 842 A.2d 379 (Pa. 2004) (holding that CAT fund cannot be liable for bad faith under 42 Pa.C.S. §8371 "because the statute requires that an action be brought under an insurance policy, and the CAT fund is not an insurer but a statutorily-created executive agency designed only to provide the coverage enumerated in the Act."); *Finkbiner,* 119 Pa. Commw. at 246-47, 546 A.2d at 1328-29 (physician could not assert common-law bad faith claim against the CAT fund since no contractual or fiduciary relationship existed between the insured physician and the CAT fund). Once again, only the legislature may rectify that dilemma for health care providers by amending the IGA Act or 42 Pa.C.S. §8371 to create a bad faith remedy for insureds of insolvent insurers who are victimized by PPCIGA's egregious failure to act in good faith in investigating, settling and paying covered claims under 40 P.S. §991.1803(b)(4).[4]

---

4. Funding shortfalls of malpractice judgments involving insureds of insolvent insurers are likely to increase following the 1996 amend-

Based upon the language of the IGA Act and HCSMA and the current state of the common law, Osborne may seek to recover directly from Dr. Neville and the Surgical Group for that portion of his malpractice judgment which has not been paid by PPCIGA, the CAT fund or any other insurer. Thus, Dr. Neville has not articulated a legal or equitable basis for staying or setting aside Osborne's execution efforts under Pa.R.C.P. 3121(b)(2)

---

ments to section 701(a) and (d) of the HCSMA, 40 P.S. §1401.701(a)(1) and (d) (repealed), and the 2002 adoption of section 711(d) of the MCARE Act, 40 P.S. §1303.711(d), increasing the basic or primary insurance coverage limits for health care providers. Under the HCSMA, the basic coverage limits were increased to $400,000 in 1999 and $500,000 in 2001 with the CAT fund's excess coverage being reduced to $800,000 in 1999 and $700,000 in 2001. See 40 P.S. §§1301.701(a)(1)(ii)-(iii) and (d)(2)-(3) (repealed). The MCARE Act maintains the basic or primary coverage limits at $500,000 from 2002 to 2006 at which time those limits will increase to $750,000. See 40 P.S. §1303.711(d). The MCARE fund's excess liability limit is reduced to $500,000 for calendar year 2003, and once the basic coverage limits have been increased to $750,000 in 2006, the MCARE fund limits are reduced further to $250,000. See 40 P.S. §1303.712(c)(2). However, although the HCSMA and MCARE Act have increased the basic coverage limits for primary malpractice insurers, the IGA Act has not implemented a corresponding increase in PPCIGA's maximum coverage of $300,000 under 40 P.S. §991.1803(b)(1)(B). As a result, if a $1,000,000 malpractice judgment is entered against a health care provider under an insolvent insurer's policy for 2003 or 2004, PPCIGA will pay $300,000 and the MCARE fund will tender $500,000 in fulfillment of their maximum statutory obligations, thereby resulting in an unfunded or unpaid judgment in the amount of $200,000. Unless the IGA Act is amended to increase PPCIGA's maximum obligation in malpractice cases or the MCARE Act is revised to lower the MCARE fund's monetary level of participation in actions involving an insolvent insurer, malpractice claimants will be deprived of full compensation for their injuries in contravention of those statutes' goals of avoiding financial loss to claimants and ensuring prompt and fair compensation for injured persons.

or (d)(3). Accordingly, an order will be entered denying the petitions of Dr. Neville and the Surgical Group to stay or set aside the execution proceedings.

## ORDER

And now, February 27, 2004, upon consideration of the petitions of Dr. Edwin C. Neville and the Surgical Group Inc. to stay the execution proceedings by plaintiff James J. Osborne pursuant to Pa.R.C.P. 3121(b)(2), or in the alternative, to set aside the writ of execution under Pa.R.C.P. 3121(d)(3), and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that the defendants' petitions to stay or set aside the execution proceedings initiated by the plaintiff are denied.